CA NO. 22-50301

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

    v.

MICHAEL AVENATTI,

      Defendant-Appellant.

DC NO. SA-19-CR-61-JVS

---

**APPELLANT'S OPENING BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE JAMES V. SELNA
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
MARGARET A. FARRAND
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081
Email: Margaret_Farrand@fd.org

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................... 1

II.   QUESTIONS PRESENTED ........................................... 3

III.  STATEMENT OF ADDENDUM ...................................... 5

IV.   STATEMENT OF JURISDICTION ................................ 5

V.    STATEMENT OF THE CASE ......................................... 6

    A.    Avenatti Obtains a Favorable Settlement for Michelle
        Phan ...................................................................... 7

        1.    Phan hires Avenatti to negotiate her exit from Ipsy .... 7

        2.    Avenatti enters a retainer agreement providing for
            a fee of 7.5 percent of any cash *and* any additional
            business assets he obtains for Phan ............................. 8

        3.    Avenatti negotiates a deal for Phan giving her Em
            Cosmetics, additional trademark, likeness, and
            image rights, and a $35 million stock buyback .......... 10

        4.    Avenatti keeps $4 million of Phan's settlement .......... 11

    B.    Avenatti Obtains a Favorable Settlement for Geoffrey
        Johnson After Paying his Living Expenses for Years .......... 12

        1.    Avenatti secures Johnson's release and dismissal of
            criminal charges, and sues Los Angeles County on
            his behalf .................................................................... 12

        2.    Avenatti pays for Johnson's expenses at care
            facilities for over three years ....................................... 13

        3.    Johnson's lawsuit settles for $4 million, after which
            Avenatti makes him periodic payments ...................... 14

# TABLE OF CONTENTS

Page

C.   Avenatti Obtains a Favorable Settlement for Alexis
     Gardner and Pays Her Living Expenses for Over a Year .... 16

     1.   Avenatti meets Gardner and finds her a residence .... 16

     2.   Avenatti secures a $3 million settlement for
          Gardner ........................................................................ 17

     3.   Avenatti misappropriates Gardner's settlement
          payment but helps her obtain an apartment, pays
          her rent for a year, and makes additional payments
          to her ............................................................................ 18

D.   Avenatti Obtains a Favorable Settlement for Gregory
     Barela and Provides Him Additional Payments .................. 19

E.   Avenatti is Indicted and Pleads Guilty ................................ 21

F.   At Sentencing, the Court Refuses to Deduct Fees, Costs,
     Expenses, and Other Payments from the Loss Amount,
     and Commits Other Errors ................................................... 21

     1.   The Presentence Report refuses offsets against the
          loss amount and proposes the obstruction-of-justice
          enhancement ................................................................. 21

     2.   Avenatti objects to the loss calculation and
          enhancements, and requests an evidentiary hearing . 24

     3.   The district court takes the entire amount of the
          settlements as the loss amount, denies an
          evidentiary hearing, and applies the obstruction-of-
          justice enhancement .................................................... 26

VI.   SUMMARY OF ARGUMENT ......................................................... 29

VII.  STANDARDS OF REVIEW ........................................................... 32

# TABLE OF CONTENTS

Page

VIII. ARGUMENT ................................................................... 34

A. The District Court Materially Erred In Its Guidelines
   Calculation, Warranting Vacatur And Remand For
   Resentencing ........................................................... 34

   1. The district court erred in imposing the obstruction-
      of-justice enhancement ................................................. 34

      a. The district court failed to make required
         express findings of falsity, willfulness, and
         materiality ........................................................... 34

      b. The district court failed to find Avenatti
         willfully and materially impeded investigation
         into the instant offense ......................................... 35

      c. The evidence failed to establish materiality ...... 36

      d. Any alleged forgery was not shown to be "with
         respect to the investigation, prosecution, or
         sentencing of the instant offense," or intended
         or likely to thwart its investigation ................... 37

      e. The obstruction-of-justice enhancement
         should be reviewed de novo ................................. 39

   2. The district court erred by relying on state law to
      refuse to deduct attorneys' fees, costs, and prior
      payments to clients from the loss amount ................... 41

      a. Guideline 2B1.1 requires a net loss approach .... 42

      b. The district court contravened Guideline
         2B1.1 by importing inapplicable principles of
         state law ............................................................... 45

# TABLE OF CONTENTS

(1) The district court's state-law-based exception contravenes the plain meaning of "loss" in Guideline § 2B1.1 ..................... 46

(2) The district court created an unwarranted exception, at odds with § 2B1.1's commentary ................................ 48

(3) The exception violates the net loss concept and Circuit law that value can be rendered even amid fraud ..................... 50

(4) The district court's novel state-specific exception would lead to uneven application ................................ 53

(5) Even if California law were relevant, the district court misapplied it ......................... 56

c. The error prejudicially impacted Avenatti's Guidelines range, warranting vacatur and remand ............................... 57

3. The district court double-counted the alleged omissions and misrepresentations in EA bankruptcy proceedings under both the bankruptcy-misrepresentation and obstruction-of-justice enhancements ............................. 61

4. The Guideline calculation errors warrant vacatur and remand for resentencing. ..................... 62

B. The District Court Abused Its Discretion By Denying An Evidentiary Hearing As To The Loss Amount..................... 63

C. The District Court Wrongly Applied a Preponderance-of-the-Evidence Standard to Enhancements that Increased Avenatti's Offense Level by 32 Levels ................... 66

# TABLE OF CONTENTS

**Page**

    D.    The District Court Clearly Erred by Concluding the New York Cases were not Relevant Conduct Requiring Concurrent Sentencing ............................................................. 69

    E.    The District Court Failed to Address Nonfrivolous Mitigating Arguments ............................................................ 74

    F.    The District Court Clearly Erred in its Restitution Calculation ......................................................................... 75

IX.    CONCLUSION ............................................................................ 77

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*United States v. Allison,*
86 F.3d 940 (9th Cir. 1996)...........................................................51, 52

*United States v. Anderson,*
741 F.3d 938 (9th Cir. 2013)................................................................76

*United States v. Avenatti,*
8 F.4th 171 (2nd Cir. 2023)..................................................................70

*United States v. Avenatti,*
Case no. 22-1242 (2nd Cir.) ..........................................................71, 73

*United States v. Barnes,*
125 F.3d 1287 (9th Cir. 1997)...............................................................44

*United States v. Begay,*
33 F.4th 1081 (9th Cir. 2022) ...............................................................76

*United States v. Berger,*
587 F.3d 1038 (9th Cir. 2009)........................................................33, 62

*United States v. Bussell,*
504 F.3d 956 (9th Cir. 2007)................................................................42

*United States v. Castillo,*
69 F.4th 648 (9th Cir. 2023) .................................................................46

*United States v. Castro-Ponce,*
770 F.3d 819 (9th Cir. 2014).........................................................34, 35

*United States v. Conner,*
811 F. App'x 787 (3d Cir. 2020) ..........................................................45

*United States v. Dadyan,*
76 F.4th 955 (9th Cir. 2023) .................................................................33

*United States v. Eckford,*
77 F.4th 1228 (9th Cir. 2023) ...............................................................40

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Emmett,*
749 F.3d 817 (9th Cir. 2014) ............................................................... 74

*United States v. Gagarin,*
950 F.3d 596 (9th Cir. 2020) ........................................................ 42, 51

*United States v. Garro,*
517 F.3d 1163 (9th Cir. 2008) ............................................................. 66

*United States v. Gasca-Ruiz,*
852 F.3d 1167 (9th Cir. 2017) ............................................................ 32

*United States v. Hahn,*
960 F.2d 903 (9th Cir. 1992) ............................................................... 33

*United States v. Harper,*
32 F.3d 1387 (9th Cir.1994) ................................................................ 43

*United States v. Hartstein,*
500 F.3d 790 (8th Cir. 2007) ............................................................... 42

*United States v. Hausmann,*
345 F.3d 952 (7th Cir. 2003) ............................................................... 44

*United States v. Herrera-Rivera,*
832 F.3d 1166 (9th Cir. 2016) ...................................................... 40, 41

*United States v. Herrera,*
974 F.3d 1040 (9th Cir. 2020) ............................................................ 50

*United States v. Holt,*
510 F.3d 1007 (9th Cir.2007) ............................................................. 61

*United States v. James,*
810 F.3d 674 (9th Cir. 2016) ............................................................... 55

*United States v. Jimenez Martinez,*
83 F.3d 488 (1st Cir. 1996) ................................................................. 65

# TABLE OF AUTHORITIES

Page(s)

*United States v. Jimenez Recio,*
371 F.3d 1093 (9th Cir. 2004) ............................................................. 64

*United States v. Kirilyuk,*
29 F.4th 1128 (9th Cir. 2022) ........................................... 40, 46, 50, 56

*Kisor v. Wilke,*
139 S.Ct. 2400 (2019) ........................................................................ 46

*United States v. Laurienti,*
731 F.3d 967 (9th Cir. 2013) .................................................... 33, 42, 44

*United States v. Lonich,*
23 F.4th 881 (9th Cir. 2022) ......................................................... 66, 67

*United States v. Luca,*
183 F.3d 1018 (9th Cir. 1999) ........................................................... 35

*Mar Oil, S.A. v. Morrissey,*
982 F.2d 830 (2d Cir. 1993) ............................................................... 53

*United States v. Markert,*
732 F.3d 920 (8th Cir. 2013) ............................................................. 43

*United States v. Marley,*
621 F. App'x 936 (11th Cir. 2015) ..................................................... 44

*United States v. Marschall,*
82 F.4th 774 (9th Cir. Sept. 20, 2023) ................................................ 49

*United States v. Matsumaru,*
244 F.3d 1092 (9th Cir. 2001) ........................................................... 75

*United States v. Matthews,*
278 F.3d 880 (9th Cir. 2002) ............................................................. 77

*United States v. Maurello,*
76 F.3d 1304 (3d Cir. 1996) .............................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

*Molina-Martinez v. United States,*
578 U.S. 189 (2016) ................................................................. 63, 68

*United States v. Moran,*
778 F.3d 942 (11th Cir. 2015) ......................................................... 76

*United States v. Mount,*
966 F.2d 262 (7th Cir.1992) ........................................................... 44

*United States v. Reza-Ramos,*
816 F.3d 1110 (9th Cir. 2016) ......................................................... 55

*Rodriguez v. Disner,*
688 F.3d 645 (9th Cir. 2012) .......................................................... 47

*Rosales-Mireles v. United States,*
138 S. Ct. 1897 (2018) ................................................................. 41

*United States v. Ruiz,*
2023 WL 6999439 (9th Cir. Oct. 24, 2023) ......................................... 41

*United States v. Slade,*
873 F.3d 712 (9th Cir. 2017) .......................................................... 32

*United States v. Spangle,*
626 F.3d 488 (9th Cir. 2010) .......................................................... 59

*Taylor v. United States,*
495 U.S. 575 (1990) .................................................................... 55

*United States v. Taylor,*
749 F.3d 842 (9th Cir. 2014) .......................................................... 36

*United States v. Thomsen,*
830 F.3d 1049 (9th Cir. 2016) ......................................................... 32

*United States v. Trujillo,*
713 F.3d 1003 (9th Cir. 2013) ......................................................... 74

# TABLE OF AUTHORITIES

Page(s)

*United States v. Turley,*
352 U.S. 407 (1957) .............................................................. 55

*United States v. West Coast Aluminum,*
265 F.3d 986 (9th Cir. 2001) ................................................ 44

*United States v. Williams,*
41 F.3d 496 (9th Cir. 1994) .................................................. 63

*United States v. Williams,*
5 F.4th 973 (9th Cir. 2021) .................................................. 34

*United States v. Zagari,*
111 F.3d 307 (2nd Cir. 1997) ............................................... 36

**State Cases**

*Cal. Pak Delivery, Inc. v. United Parcel Service, Inc.,*
52 Cal. App. 4th 1 (1997) .................................................... 57

*Clark v. Millsap,*
197 Cal. 765 (Cal. 1926) ...................................................... 47

*Fairfax Sav., F.S.B. v. Weinberg & Green,*
112 Md. App. 587 (1996) ..................................................... 54

*Hance v. Super Store Indust.,*
44 Cal. App. 5th 676 (2020) ................................................. 56

*Internat'l Mat'ls Corp. v. Sun Corp., Inc.,*
824 S.W. 2d 890 (Mo. 1992) ................................................ 54

*Jeffry v. Pounds,*
67 Cal. App. 3d 6 (1997) ...................................................... 57

*Searcy, Denney, et. al v. Scheller,*
629 So. 2d 947 (Fla. App. 1993) ........................................... 54

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.,*
198 Cal. Rptr. 3d 253 (2016) ................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

*Sheppard, Mullin, Richter & Hampton LLP v. J-M Mfg. Co.,*
*Inc.,*
    6 Cal. 5th 59 (2018) ....................................................... 56

*Spencer v. Badgley Mullins Turner PLLC,*
    432 P.3d 821 (Wash. Ct. App. 2018) ............................... 54

## Federal Statutes

18 U.S.C. § 1111 ................................................................... 55

18 U.S.C. § 1343 ..................................................................... 5

18 U.S.C. § 3231 ..................................................................... 6

18 U.S.C. § 3742 ..................................................................... 6

26 U.S.C. § 7212 ..................................................................... 5

28 U.S.C. § 1291 ..................................................................... 6

## Federal Sentencing Guidelines

U.S.S.G. App. C., Vol. II, Amend. 617 ........................... 43, 52

U.S.S.G. § 1B1.3 ................................................................. 71

U.S.S.G. § 1B1.3, cmt. n.5 ............................................ 71, 72

U.S.S.G. § 2B1.1 ............................................................ *passim*

U.S.S.G. § 2B1.1, cmt. n.3 ............................... 42, 43, 49, 50

U.S.S.G. § 2B1.1, cmt. n.8 ................................................ 62

U.S.S.G. § 3C1.1 ............................................................ 38, 39

U.S.S.G. § 3C1.1, cmt. n.1 ................................................ 39

U.S.S.G. § 3C1.1, cmt. n.6 ................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

U.S.S.G. § 3D1.2 ........................................................................ 71

U.S.S.G. § 5G1.3 ........................................................................ 69

U.S.S.G. § 6A1.3 ........................................................................ 63

U.S.S.G. § 6A1.3, Commentary .................................................. 63

## Other Authorities

U.S. CONST., amend. I ................................................................ 26

Cal. R. Prof. Conduct 1.15 .................................................. 15, 57

# I. INTRODUCTION

Attorney Michael Avenatti did both wrong and right by his clients. On the wrong side of the ledger, he misappropriated settlement money from clients Geoffrey Johnson, Alexis Gardner, Gregory Barela, and Michelle Phan. On the right side, he performed work that provided them with tangible benefits, including helping secure Johnson's release from jail and dismissal of Johnson's criminal charges, paying years' worth of their living expenses, winning them settlements, and securing Phan ownership of a multi-million dollar company and other assets that—but for Avenatti's efforts—she might never have obtained.

The Sentencing Guidelines require courts to take both sides of this ledger into account when calculating victims' losses from fraud. They employ a net approach, defining loss as the difference between what victims would have received, but for the fraud, and what they actually received. But the district court disregarded that rule here and only considered one side of the ledger. Instead of determining what the victims actually lost because of Avenatti's fraud, the district court wrongly relied on inapplicable principles of California civil law to define "loss" as a counterfactual amount that included amounts of money the

clients never would have received even had no fraud occurred, such as the attorneys' fees, costs, and expenses they would have owed *to Avenatti* pursuant to their written agreements. It further inflated the loss amount, in contravention of the Guidelines, by refusing to offset the amount by the significant sums Avenatti undisputedly paid the clients before his fraud was discovered, including for living expenses, specialized medical care (in Johnson's case), and rent. And it further erred by excluding, as supposedly "unrelated" work, the multi-million dollar value of the cosmetics company and other assets Avenatti obtained for Phan that were, in fact, an integral part of the work she had hired him to perform.

Avenatti's attorneys' fees and costs were not losses caused by the fraud because, without the fraud, the clients would never have received them. And the amounts Avenatti paid to the clients were also not losses, because the clients actually *did* receive them. Yet the district court refused to deduct them when calculating loss, even though the Guidelines require it.

The district court also committed a host of other errors, including (i) failing to make required factual findings (or even *any* factual

findings) before imposing an obstruction-of-justice enhancement under Guideline 3C1.1, (ii) double-counting Avenatti's bankruptcy-related statements for enhancement purposes, (iii) failing to require clear-and-convincing evidence of enhancements responsible for a 32-level increase in Avenatti's offense level, (iv) running what should have been concurrent sentences consecutively, (v) failing to address and consider certain of Avenatti's nonfrivolous mitigation arguments, and (vi) miscalculating the restitution award. Because these myriad errors resulted in years of unwarranted incarceration, this Court should vacate Avenatti's 168-month sentence and remand for resentencing on an open record.

## II. QUESTIONS PRESENTED

1. Did the district court commit procedural error by miscalculating Avenatti's Guidelines range, where it:

- failed to make express factual findings that prior testimony by Avenatti was false, willful, and material, as required by this Court's precedents to support the obstruction-of-justice enhancement under Guideline 3C1.1, and where the enhancement was inadequately supported;

- failed to offset from its loss calculation under Guideline 2B1.1
  (i) amounts Avenatti paid to his clients before the fraud was
  detected, and (ii) amounts Avenatti's clients agreed he was
  entitled to deduct for fees, costs, and expenses;

- double-counted Avenatti's alleged misrepresentations and
  omissions in a prior bankruptcy proceeding under both the
  bankruptcy-obstruction enhancement of Guideline 2B1.1(b)(9)
  and the obstruction-of-justice enhancement of Guideline 3C1.1?

2. Did the district court abuse its discretion by denying Avenatti's
request for an evidentiary hearing as to the loss amount, where
Avenatti alleged and sought to prove he was contractually entitled to
over $4 million in offsets?

3. Did the district court err in failing to require proof by clear-and-
convincing evidence of enhancements causing a cumulative 32-level
increase in Avenatti's offense level?

4. Did the district court clearly err in declining to find that
Avenatti's two New York cases constituted relevant conduct to this case,
so as to require concurrent sentencing, when they involved similar
facts, purpose, and modus operandi during an overlapping time period?

5. Did the district court abuse its discretion in failing to consider or address Avenatti's nonfrivolous mitigation arguments?

6. Did the district court clearly err in deeming Avenatti's acquisition of Em Cosmetics for Phan "unrelated work" not "covered by his contract[]" with Phan, where that contract expressly defined Avenatti's fee as based on the value of any business "benefit," "business accommodation," or "funding" received in connection with Phan's exit from Ipsy?

7. Did the district court clearly err in failing to discount the restitution award for Avenatti's fee earned in connection with Em Cosmetics and other assets he obtained for Phan, by deeming them outside the scope of his retainer agreement?

## III. STATEMENT OF ADDENDUM

Pertinent authority is reproduced in the attached addendum.

## IV. STATEMENT OF JURISDICTION

Michael Avenatti appeals his 168-month prison sentence for four counts of wire fraud, 18 U.S.C. § 1343, and one count of endeavoring to obstruct the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Judgment was entered on December 28, 2022, (1-ER-2; 12-ER-

2863 (Dkt. 1060)),[1] and Avenatti filed a timely notice of appeal on

January 6, 2023. (12-ER-2787.) The district court had jurisdiction under

18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291

and 18 U.S.C. § 3742. Avenatti is serving his sentence, with a projected

release date of November 18, 2035.

## V. STATEMENT OF THE CASE

Michael Avenatti is a self-made man. He endured a difficult

childhood, was the first in his family to graduate college, and worked to

pay his way through law school at George Washington University while

attending night classes.[2] He earned a place on the law review,

graduated first in his class, and went on to found, in 2006, the law firms

Eagan Avenatti ("EA") and Avenatti and Associates ("A&A") in Orange

County, California. He handled high-impact cases, winning multi-

million dollar settlements that advanced the public good: among others,

a $41 million jury verdict on behalf of defrauded investors in 2008, a

---

[1] Excerpts of Record are cited as "[volume]-ER-[page]." Under-seal volumes containing the presentence report and associated documents are cited as "[volume]-PSR-[page]."

[2] The facts in this paragraph are drawn from the defense sentencing position and exhibits at 3-PSR-465-69 and 520-626.

$454 million jury verdict against the Kimberly Clark Corporation for sale of defective personal protective equipment in 2017, and, in 2014, an $80 million settlement on behalf of Jewish families for desecration of their deceased relatives' remains. In recognition of his contributions, Avenatti was voted Trial Lawyer of the Year in 2009, honored by the California Assembly for his commitment to legal ethics and preservation of the justice system, and earned the National Public Justice Trial Lawyer of the Year award in 2018.

Relevant to this case, Avenatti also represented, and won significant settlements for, clients Geoffrey Johnson, Alexis Gardner, Gregory Barela, and Michelle Phan. Their cases are described below.

## A.  Avenatti Obtains a Favorable Settlement for Michelle Phan

### 1.  Phan hires Avenatti to negotiate her exit from Ipsy

Michelle Phan is a beauty influencer and entrepreneur. (3-ER-440-41; 6-ER-1237-38.) She co-founded Ipsy, a personalized beauty subscription company of which—until 2018—she was a major shareholder. (3-ER-447-48; 4-ER-708-09, 713.) Long Tran, also an Ipsy shareholder, was Phan's business manager and handled her financial affairs. (3-ER-442; 4-ER-708-09, 724.)

In early 2017, and as a result of significant disputes with Ipsy's controlling management and shareholders, Phan and Tran decided to attempt to force the private company to repurchase their shares and part with other valuable assets. (3-ER-448, 578; 4-ER-709; 5-ER-1115-16.) Phan believed she should receive about $30 million for her equity in Ipsy. (3-ER-447-48.) Simultaneous with that sellback, Phan also wanted to obtain ownership of a company called Em Cosmetics ("Em"), that Ipsy owned. (3-ER-447, 492, 580; 6-ER-1239-41, 1249-50; 11-ER-2547.)

Seeking assistance with negotiating their exit from Ipsy—which promised to be contentious—Tran contacted an attorney acquaintance named Filippo Marchino, explaining that Phan wanted counsel to help her "purchase Em Cosmetics from Ipsy in parallel with selling her shares of the company." (6-ER-1239-41, *see also* 11-ER-2547.) Marchino referred Tran to Avenatti. (6-ER-1239.)

### 2. Avenatti enters a retainer agreement providing for a fee of 7.5 percent of any cash *and* any additional business assets he obtains for Phan

Avenatti and Tran negotiated a written retainer agreement, which provided that Avenatti would represent Phan "in connection with [her] affirmative claims, divestiture, and exit" from Ipsy. (6-ER-1242-48;

2551-55.) Phan, Tran, and Marchino all testified that obtaining Em was "part of the deal" Avenatti was to negotiate for Phan. (6-ER-1249-50; *see also* 3-ER-447, 492, 580; 5-ER-1120.)

Avenatti's retainer agreement with Phan entitled him to a "contingent fee" of 7.5 percent of the "Recovery." (11-ER-2553.) The "Recovery," in turn, was defined broadly to include not just the "cash" Ipsy paid Phan for her shares, but also "the fair market value of any benefit, refund, carried interest, business accommodation, loan, and/or funding received in connection with the settlement, judgment, or any other resolution of any of Clients' claims, divestiture, and/or exits [from Ipsy]." (11-ER-2553.)

This expansive definition of "Recovery" was specifically bargained for by the parties. Tran testified that he initially wanted to define "Recovery" more narrowly to include only the cash Phan received for her shares. (4-ER-714-17.) To that end, he specifically redlined out from a draft version of the agreement the broader definition "any benefit, refund, carried interest, business accommodation," etc. (4-ER-716-17; 11-ER-2574.) But Avenatti rejected this proposal, and that narrower definition is not the one to which the parties ultimately agreed:

Avenatti's final agreement with Phan included the broader definition of "Recovery" subject to the 7.5 percent fee, that included "any benefit, refund, carried interest, [or] business accommodation" Avenatti obtained for Phan. (4-ER-719-21; 11-ER-2553.)

### 3. Avenatti negotiates a deal for Phan giving her Em Cosmetics, additional trademark, likeness, and image rights, and a $35 million stock buyback

Avenatti went to work on Phan's case.[3] He spent months collecting information from Phan and Tran in preparation to approach the company. (3-ER-578-82.) Once the negotiations began, they were very contentious. (5-ER-1116.) Ultimately, Avenatti's work yielded Phan a settlement that included everything she sought: ownership of Em, additional rights in her trademarks, license, and image, and a total of over $35 million for her Ipsy shares—$5 million more than Phan had expected. (5-ER-1120; 11-ER-2556-66; 4-PSR-696.) These provisions were embodied in multiple agreements, including a "Common Stock Repurchase Agreement" providing for Ipsy's repurchase of Phan's shares, and an "Asset Purchase Agreement" that provided for Phan's

---

[3] Avenatti also negotiated for the sale back of shares belonging to Tran and to Phan's sister-in-law, Pratigya Phan. (4-ER-723.)

acquisition of Em. (3-ER-584-85.) Avenatti alleged at sentencing—and the government did not dispute—that Em's value was over $58 million. (2-ER-161.)

### 4. Avenatti keeps $4 million of Phan's settlement

The stock buyback portion of Phan's Common Stock Repurchase Agreement provided Ipsy would make two payments to Phan for her shares: an initial payment of $27,478,940, and another payment of $8,146,288. (4-ER-725; 11-ER-2556-57; 1-PSR-134-35.)

The first payment reached Phan without issue. (3-ER-452-53.) In September 2017, Ipsy wired $27,414,668.32[4] to the EA client trust account. (4-ER-728-31; 12-ER-2647.)[5] Avenatti deducted his 7.5 percent fee, $2,787,650.87, and wired Phan the rest. (2-ER-349-51; 4-ER-732-34; 11-ER-2644.)

Ipsy made the second payment in March 2018. (4-ER-737-46; 11-ER-2571.) But it did not arrive in Phan's bank account. Ipsy sent it to the EA client trust account but Avenatti, instead of sending it to Phan,

---

[4] The initial $27,478,940 payment was reduced by the purchase price of certain options. (11-ER-2557.)

[5] Ipsy also made payments to Tran and Pratigya Phan for their shares. (4-ER-730.)

used $3 million of that amount to pay the trustee of EA's then-pending bankruptcy proceeding to release EA from bankruptcy, meet payroll expenses for EA, and make payments to Gardner, Johnson, and Barela. (2-ER-352-63; 8-ER-1612-21; 7-PSR-1564.) Two months later, Avenatti caused approximately $4,146,288 of Phan's anticipated $8,146,288 payment to be wired to Phan's bank account. (3-ER-563-64; 8-ER-1631-33; 12-ER-2659.) Avenatti told Tran this amount was being sent in three transfers: two for $4 million, and one for $146,288, but it actually was only two: one for $4 million, and one for $146,288. (8-ER-1631-32; 12-ER-2659; 7-PSR-1565.) Phan never received the remaining $4 million. (3-ER-564-72; 7-PSR-1565.)

## B.    Avenatti Obtains a Favorable Settlement for Geoffrey Johnson After Paying his Living Expenses for Years

### 1.    Avenatti secures Johnson's release and dismissal of criminal charges, and sues Los Angeles County on his behalf

In 2011, Geoffrey Johnson was incarcerated in Los Angeles. Injuries from a fall in jail had left him a paraplegic and confined to a wheelchair. (10-ER-2129-30; 2-PSR-381.) Imprisoned, disabled, and facing criminal charges, Johnson felt he was in "hell." (10-ER-2189-90, 2202-03.)

Seven or eight months into Johnson's incarceration, in late 2011, Johnson's family asked Avenatti to visit him. (10-ER-2187.) Avenatti and a lawyer he hired to assist did so, secured Johnson's release, and got Johnson's criminal charges dismissed. (10-ER-2187-2193.) Avenatti paid for Johnson's criminal defense lawyer's work on the case. (10-ER-2195.)

Avenatti filed a lawsuit on Johnson's behalf against Los Angeles County for damages relating to his injuries. (10-ER-2130.) Avenatti's retainer agreement entitled him to a 40 percent contingent fee from any settlement, and reimbursement of costs and expenses. (10-ER-2131-33; 11-ER-2430-32.) Avenatti began working on the case.

## 2. Avenatti pays for Johnson's expenses at care facilities for over three years

Avenatti also arranged for Johnson to have a place to stay and means to live after his release from jail. Johnson's new residence, paid for by Avenatti, was a rehabilitation facility called CareMeridian. Johnson considered the care there excellent, and appreciated that the facility helped him transition to being functional despite his disability. (10-ER-2193-94, 2203-05.) He had his own room and was attended by nurses and physical and occupational therapists. (10-ER-2193-94.)

Avenatti and his firm also paid for a case manager to help Johnson navigate the healthcare system, advocate for him, and help him find a primary care physician. (10-ER-2205-06.)

After ten months at CareMeridian, Johnson's case manager arranged for him to be moved to an assisted living facility called Sunrise of West Hills. (10-ER-2206-08.) Sunrise had care managers on call, to help residents with whatever they needed. (10-ER-2208.) Johnson lived there for two and a half years, until about mid-2015. (10-ER-2208-09.) EA paid for his residence at Sunrise, and all of his other expenses, during this time. (10-ER-2209.)

### 3. Johnson's lawsuit settles for $4 million, after which Avenatti makes him periodic payments

In January 2015, Avenatti reached a settlement with Los Angeles County in Johnson's lawsuit, which required the County to make a single $4 million payment to Johnson. (10-ER-2305-06; 2315-18; 11-ER-2435-38.) That month, the County sent a $4 million check to an EA client trust account. (9-ER-1880-83; 10-ER-2319-22; 11-ER-2445-46, 2452; 12-ER-2713.) Avenatti withdrew his attorneys' fee, costs, and

expenses, which totaled $2,339,660.32.[6] (2-ER-313-16; 9-ER-1884-1904; 11-ER-2454-65; 12-ER-2713, 2719.) But he did not pay the balance of the $4 million to Johnson. (2-ER-310-19; 9-ER-1905.) Instead, he used it for personal and business expenses, and Johnson's ongoing living expenses. (2-ER-315-19; 12-ER-2751-65.)

For the next four years, from approximately February 2015 through March 2019, Avenatti did not tell Johnson that he had received the $4 million settlement. (10-ER-2146-48.) Instead, Avenatti paid almost all of Johnson's living expenses, including rent, telling him they were advances on a settlement that had not yet been paid. (7-PSR-1559, ¶ 47(a).) Johnson periodically asked Avenatti for money, always requesting under $2,000 so as not to jeopardize his eligibility for Social Security benefits. (10-ER-2146-48.) The expenses paid by EA and Avenatti during this time included—in addition to Care Meridian and Sunshine of West Hills—18-hour-a-day care at an assisted living center. (10-ER-2210-13.)

---

[6] This complied with California Rule of Professional Conduct 1.15(c)(2), which requires attorneys to withdraw fees from settlement payments received for the client "at the earliest reasonable time after the lawyer or law firm's interest in that portion becomes fixed."

On March 15 and 22, 2019, Avenatti testified at judgment debtor examinations in a separate lawsuit and was asked (among other things) whether the County had paid the $4 million settlement and whether he (Avenatti) had taken the settlement money. (4-ER-691-96; 9-ER-2000-2011.)

It was undisputed that Avenatti's contingent fee from the $4 million Johnson settlement amounted to $1,600,000, that Avenatti paid at least $545,838 in costs and expenses in connection with Johnson's case through January 2015, and that Avenatti paid Johnson at least $282,070 for rent and other living expenses between January 2015 and March 2019. (1-PSR-130-31.)

## C. Avenatti Obtains a Favorable Settlement for Alexis Gardner and Pays Her Living Expenses for Over a Year

### 1. Avenatti meets Gardner and finds her a residence

In December 2016, Alexis Gardner was a theatre student living out of her car. (7-ER-1428, 1531-33.) She hired Avenatti to represent her in connection with potential legal claims against her former boyfriend, Hassan Whiteside, a professional basketball player. (7-ER-1428-29, 1535-38.) Avenatti's retainer agreement entitled him to a contingency fee of 33 percent of any recovery reached before filing a

lawsuit, and 40 percent if recovery was reached after a lawsuit was filed. (7-ER-1538; 11-ER-2466.)

At their initial meeting, Gardner told Avenatti she was living out of her car. (7-ER-1426-27.) Avenatti was appalled, and immediately arranged for Gardner to stay at a nearby Sofitel Hotel at his expense. (7-ER-1426-27, 1539.) Gardner stayed there for about two and a half weeks. (7-ER-1427-28.)

### 2. Avenatti secures a $3 million settlement for Gardner

Avenatti began working on Gardner's case, including by having an attorney travel to Italy to investigate Gardner's allegations against Whiteside. (6-ER-1214, 1314.) In January 2017, Avenatti and Gardner attended an all-day mediation with Whiteside and his counsel that resulted in a settlement. (7-ER-1480, 1496-1500, 1540-42.) Avenatti had Gardner sign the settlement agreement, and correctly told her the settlement amount was $3 million. (7-ER-1541-42.)

Gardner's settlement agreement provided for Whiteside to make an initial payment of $2.75 million in January 2017, followed by a second $250,000 payment three years later. (11-ER-2472.) But Garner claimed Avenatti instead told her she would receive a lump sum,

followed by $20,000 per month for the next eight years. (7-ER-1543.)

Gardner testified that Avenatti did not specify the amount of the lump

sum, but said it would allow her to "get on [her] feet, pay off some of

[her] debt, and furnish [her] apartment." (7-ER-1543.)

### 3. Avenatti misappropriates Gardner's settlement payment but helps her obtain an apartment, pays her rent for a year, and makes additional payments to her

As required by the settlement, Whiteside sent a $2.75 million wire

transfer to the EA trust account for Gardner on January 25, 2017. (7-

ER-1478-80; 11-ER-2480-81.) But instead of sending it to Gardner,

Avenatti the following day wired $2.5 million of that amount for the

purchase of a Honda airplane, and the remaining $250,000 to a

different EA account. (2-ER-327-31; 6-ER-1225-28; 8-ER-1720-28; 11-

ER-2469-70, 2476, 2482-87; 12-ER-2766-67.)

On January 20, 2017—days before receiving the wire from

Whiteside—Avenatti had paid for a year's worth of apartment rent on

Gardner's behalf, totaling $51,935. (7-ER-1548-51.) He also sent her

additional $16,000 checks throughout the year and one check for

$34,000 in 2018. (7-ER-1381-82; 11-ER-2497-2523; 7-PSR-1561-62.)

Gardner did not know these checks were from Avenatti; she believed

18

they were being made by Whiteside under the settlement. (7-ER-1552.) These amounts were in addition to the rent payments Avenatti had made.

After not receiving the balance of the settlement money, Gardner met with the government regarding Avenatti's prosecution in early 2019. (7-ER-1436.) Gardner received most of the second installment payment under her settlement, of $250,000, in November 2020. (5-ER-1095-96; 6-ER-1332.)

It was undisputed that Avenatti's contingency fee from the Gardner settlement was $990,000, that EA's costs and expenses for Gardner's case were at least $71,715, and that Avenatti made additional payments to Gardner of at least $227,500 from December 2016 through March 2019. (1-PSR-132-33.)

## D. Avenatti Obtains a Favorable Settlement for Gregory Barela and Provides Him Additional Payments

In September 2014, Gregory Barela retained Avenatti to represent him in an intellectual property dispute against Brock, U.S.A. (5-ER-937-40; 11-ER-2524-27.) He signed a retainer agreement with Avenatti that provided for a 40 percent attorneys' fee from any settlement. (5-ER-938-45; 11-ER-2525.)

In December 2017, Avenatti reached a settlement agreement with Brock. (5-ER-948-50, 954-55; 11-ER-2535-46.) It provided that Brock would pay Barela $1.9 million: $1.6 million on January 10, 2018, and additional payments of $100,000 on January 10 of each of the following three years: 2019, 2020, and 2021. (4-ER-685; 11-ER-2538.)

In January 2018, Brock made the initial $1.6 million payment to Barela by wiring it to the EA client trust account. (4-ER-686.) But instead of telling Barela the payment had been made, Avenatti used it to pay miscellaneous expenses, including for his coffee company, Global Baristas. (2-ER-339-44; 12-ER-2772-73.) Throughout 2018 Avenatti made payments to Barela to help him with expenses: $60,000 in April, $30,000 in May, $30,000 in June, $6,000 in September, and $4,000 in November. (4-ER-686.) In November 2018, Barela hired new counsel to attempt to recover the Brock settlement payment. (4-ER-682; 7-PSR-1563.)

It was undisputed that Avenatti's fee from the Brock settlement was $760,000, EA's expenses for Barela's case were at least $111,113, and that Avenatti made at least $130,000 of payments to Barela for living expenses. (1-PSR-133-34.)

## E. Avenatti is Indicted and Pleads Guilty

In April 2019, Avenatti was charged in an indictment with wire fraud, tax offenses, bank fraud, aggravated identity theft, and concealment of assets. (11-ER-2369-2429.)

After a 26-day jury trial—and in the middle of Avenatti's defense case—the district court granted a mistrial due to the government's failure to produce exculpatory evidence regarding the amount of Avenatti's fees and costs expended in the clients' cases. (2-ER-269.) Avenatti subsequently pled guilty, without a plea agreement, to four counts of wire fraud and one count of attempting to interfere with the administration of the Internal Revenue Service. (2-ER-167, 186-96.)

## F. At Sentencing, the Court Refuses to Deduct Fees, Costs, Expenses, and Other Payments from the Loss Amount, and Commits Other Errors

### 1. The Presentence Report refuses offsets against the loss amount and proposes the obstruction-of-justice enhancement

In preparation for sentencing, the probation office issued a Presentence Report ("PSR") containing a proposed Guideline

calculation.[7] Under Guideline 2B1.1, applicable to fraud, it calculated a base offense level of 7, then added 20 levels for loss between $9,500,000 and $25,000,000, concluding that a total of $12,350,000 was lost by Avenatti's four clients: Phan ($4 million), Johnson ($4 million), Gardner ($2.75 million), and Barela ($1.6 million). (7-PSR-1573-74.)

The PSR declined to allow any offsets from the loss calculation for Avenatti's attorneys' fees, costs and expenses, or other payments made to the clients before detection of the fraud. Instead, it concluded that "[b]ecause Avenatti lied to his clients about the settlements and his receipt of the settlement money, he is not entitled to a credit against the full amount of the client monies that he stole for his fees and expenses." (7-PSR-1574 ¶106.) For this proposition, the PSR cited California civil fee recovery cases as holding that "[f]raud or unfairness on the part of the attorney will prevent him from recovering for services rendered." (7-PSR-1574, n.15.)

The PSR further enhanced Avenatti's offense level by 2 levels for substantial financial hardship to 4 or fewer victims, 2 levels for false

---

[7] Unless otherwise specified, references are to the amended, not original, PSR.

statements in a bankruptcy proceeding (based on statements Avenatti made in EA's bankruptcy), 2 levels for sophisticated means, 2 levels for a vulnerable victim, 2 levels for abuse of trust, and 2 levels for obstruction of justice, based on a tweet Avenatti made that—the government contended—threatened to reveal private information about Gardner's and Whiteside's settlement. (7-PSR-1575-79.)

All told, the PSR calculated Avenatti's total offense level at 39, without a deduction for acceptance of responsibility. (7-PSR-1581-83). It also calculated a criminal history score of six—Category III—based on two contemporaneous criminal cases in New York. (7-PSR-1585-89.) The resulting Guidelines range was 324-405 months. (7-PSR-1535, 1551.)

Probation then recommended a five-level downward variance to 188 months.[8] (7-PSR-1536.) It reasoned that Criminal History Category III was overstated because Avenatti's New York cases could have been combined into one case to produce just three, instead of six, criminal

_____

[8] Probation had originally recommended 151 months, including a reduction for acceptance of responsibility. (1-PSR-3, 46-47.) Though the amended PSR removed that reduction, the district court sustained Avenatti's objection and awarded it.

history points. (7-PSR-1544.) It also cited Avenatti's difficult childhood,

overcoming adversity, and obtaining impactful and beneficial

settlements for clients in other cases. (*Id.*) It recommended that the

court order Avenatti's sentence to run concurrently with those in the

New York cases, concluding that consecutive sentences would be an

"unreasonable incremental punishment." (7-PSR-1545.)

### 2.  Avenatti objects to the loss calculation and enhancements, and requests an evidentiary hearing

Avenatti objected to the PSR's loss calculation, including its

failure to offset attorneys' fees, costs, and payments he made to clients

before the fraud was discovered, as required by application note 3(E)(i)

to Guideline 2B1.1. (1-ER-64-68; 2-ER-151-56; 3-PSR-493-94.) He

argued that the loss amount for Phan should be less than zero, because

he had secured Phan valuable assets including Em Cosmetics and

trademark and image rights, as to which his 7.5 percent contingency fee

exceeded the $4 million the government claimed he had failed to remit

to Phan from her settlement. (2-ER-160-62; 3-PSR-494.) He also argued

that—after deducting attorneys' fees, costs, and expenses, and other

legal work he performed for the clients—Barela was due no more than

$529,203, Gardner was due no more than $1,460,750, and that Johnson was due no more than $1,484,868. (2-ER-157-60.) Altogether, Avenatti argued that the correct loss range was $1,500,000-$3,500,000, resulting in a 16-level increase over the base offense level of 7 under § 2B1.1. (3-PSR-505.)

Because the parties' loss calculations were so far apart—with the government's calculation over three times higher than Avenatti's—Avenatti also requested an evidentiary hearing into the loss amount and particularly the value of business assets, including Em, he secured for Phan. (2-ER-145-66; 3-PSR-494.) In support of that request he submitted a draft of Phan's Asset Purchase Agreement with Ipsy that provided for her to purchase Em and obtain rights in her trademark, license, and image. (2-ER-161; 4-PSR-696.) He argued that his work enabled Phan to obtain these assets at significantly reduced prices, and that Em was valued at "well over $58 million"—an assertion the government did not contest. (2-ER-161.) He also argued a hearing was necessary to determine the extent of the costs, expenses, and advances he incurred in Johnson's, Gardner's and Barela's cases, because the government's figures were incomplete. (2-ER-150-62.)

Avenatti also objected to, among other things, the district court's application of the obstruction-of-justice enhancement, arguing that the tweet on which the PSR based that enhancement was protected First Amendment conduct, and not intended to intimidate. (1-ER-71; 3-PSR-496-98; 7-PSR-1345-46.)

Agreeing with the probation office, Avenatti further argued that the district court should run the sentence for this case concurrently with the sentences in his New York cases, because those cases were relevant conduct under Guideline 1B1.3. (3-PSR-505.)

### 3. The district court takes the entire amount of the settlements as the loss amount, denies an evidentiary hearing, and applies the obstruction-of-justice enhancement

Before sentencing, the district court denied an evidentiary hearing into the value of Em or the calculation of Avenatti's costs, expenses, and advances to the clients, reasoning that the trial had already provided sufficient opportunity to explore those issues. (1-ER-126.) It did so despite the fact that the trial was never completed, and—due to the mistrial—Avenatti never had an opportunity to present his full defense.

At sentencing, the district court adopted the PSR's and government's claim that the loss amount should not be offset for

attorneys' fees, costs, or amounts Avenatti paid the clients before the fraud was discovered. For this it relied on the California civil law cases cited in the PSR, stating that under California law "[f]raud or unfairness on the part of the attorney <u>will prevent him from recovering for services rendered</u>." (1-ER-12) (underlining in original.) It thus applied, to the base offense level of 7, a 20-level enhancement for loss between $9,500,000 and $25,000,000 under Guideline 2B1.1(b)(1)(K). (*Id.*)

The district court also applied each of the enhancements probation had recommended, for a total of twelve additional levels. (1-ER-12-16.) It based the obstruction-of-justice enhancement on Avenatti's "testimony at various related judgment debtor exams, bankruptcy proceedings, and other proceedings." (1-ER-15.) It then concluded, without further explanation, that "[t]he Government's showing supports application of the [obstruction-of-justice] enhancement." *Id.* It also stated that the government had "advance[d] evidence of Avenatti's efforts to forge . . . his law partner's signature on a settlement agreement to be used in the bankruptcy" and concluded that "[t]his also supports the enhancement." (1-ER-16.) But the district court never

made any findings that any of Avenatti's statements was false, willfully so, or material to the proceeding in which it was made—or even that Avenatti intended to obstruct justice in the instant case. After enhancements, the court calculated Avenatti's offense level at 39, then decreased it to 37 for acceptance of responsibility (1-ER-16-17.).

Starting with a Guidelines range of 262-327 months, the district court adopted a four-level downward variance, to 168-210 months, in recognition of Avenatti's difficult childhood, perseverance, positive professional accomplishments and "substantial charitable activities," and harsh conditions he endured in pretrial detention in New York. (1-ER-18-22, 122.) It then adopted the low-end of the downward-varied range: 168 months. But contrary to the probation office's recommendation, the court imposed that sentence consecutively to Avenatti's sentences in his New York cases, concluding—with little to no analysis—that they did not constitute relevant conduct under Guideline 1B1.3. (1-ER-22.)

In calculating restitution—unlike in its loss calculation—the district court *did* permit offsets for fees, costs, and remitted amounts. (1-ER-22-23.) In doing so, it relied on the government's position to

conclude that the loss amount—accounting for offsets—was $7,603,564. (1-ER-2, 22-23.) But it refused to further offset the restitution amount for the value of other services provided by Avenatti or the value of Em or Phan's other business assets Avenatti obtained. The court concluded that those assets resulted from "other work not associated with the second part of the $8,146,000 payment" from Ipsy for Phan's shares, and said it was "reject[ing]" that offset as a "claim[] for other additional unrelated work." (1-ER-23.) The court did not address the definition of the "Recovery" in Avenatti's fee agreement, which expressly included business assets and benefits.

## VI. SUMMARY OF ARGUMENT

The Court should vacate Avenatti's 14-year (168-month) sentence and remand for resentencing on an open record, because the district court made several errors—each over Avenatti's timely objection—that resulted in an erroneous and materially inflated Guideline range and an excessive nearly 20-year combined sentence including the New York cases.

*First*, the district court erred by applying the obstruction-of-justice enhancement without making the findings required by this Court's

clear precedent—specifically, that Avenatti's statements were false, willfully false, and material, or that Avenatti willfully and materially obstructed justice with respect to the offenses in this case. The court made no findings on any of those issues; it simply made a general reference about the government's sentencing pleadings "support[ing] the enhancement." The government's evidence was also insufficient to show the testimony was material to the proceedings in which it occurred, as the enhancement requires.

*Second*, the district court erred by refusing to offset attorneys' fees, costs, and payments to clients from its loss calculation. Instead of following the net-loss approach Guideline 2B1.1 requires—subtracting what the client was left with after the fraud from what she would have had absent the fraud—the district denied offsets for amounts the clients never would have obtained without the fraud, as well as amounts the clients actually *did* obtain. It did this by relying on an inapplicable body of California case law governing recovery of attorneys' fees in civil cases: a separate issue not implicated here. The district court's reliance on state fee recovery law contravened Guideline 2B1.1's text and commentary, ignored its net loss approach, threatens uneven sentences

among similar fraud defendants state-to-state, and—even if California law were relevant—misapplied California law.

*Third*, the district court wrongly double-counted Avenatti's alleged misrepresentations and omissions in a prior bankruptcy proceeding under both the bankruptcy-obstruction enhancement (U.S.S.G. § 2B1.1(b)(9)) and the obstruction-of-justice enhancement (U.S.S.G. § 3C1.1).

*Fourth*, the district court abused its discretion by denying an evidentiary hearing into the loss amount based on a clearly-erroneous finding that Avenatti's trial constituted an adequate hearing on that issue, when in fact a mistrial was granted before Avenatti could finish presenting his case and the mistrial rendered the prior proceedings a nullity in any event.

*Fifth*, the district court erred by failing to require clear-and-convincing evidence of enhancements causing a cumulative 32-level enhancement in Avenatti's offense level.

*Sixth*, the district court clearly erred in summarily concluding that Avenatti's two prior New York cases were not relevant conduct so as to require concurrent sentences.

*Seventh*, the district court abused its discretion by failing to address numerous nonfrivolous arguments Avenatti presented for a lower sentence.

*Eighth*, the district court clearly erred by rejecting an offset against restitution for the value of other services Avenatti provided and the value of Em based on its finding that the acquisition of Em was "other, unrelated work," not "covered by" Avenatti's retainer with Phan. Trial evidence showed the contrary.

## VII. STANDARDS OF REVIEW

"A mistake in calculating the recommended Guidelines range is a significant procedural error that requires [this Court] to remand for resentencing." *United States v. Slade*, 873 F.3d 712, 716 (9th Cir. 2017) (cleaned up). This Court reviews district courts' interpretations of the federal Sentencing Guidelines de novo, its factual determinations for clear error, and its application of the Sentencing Guidelines to the facts for abuse of discretion. *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc). The court's method of calculating loss is reviewed de novo. *United States v. Thomsen*, 830 F.3d 1049, 1071 (9th Cir. 2016).

Whether the district court applied an incorrect standard of proof to sentencing enhancements is reviewed de novo. *United States v. Berger*, 587 F.3d 1038, 1042 (9th Cir. 2009).

A district court's decision to deny an evidentiary hearing at sentencing is reviewed for abuse of discretion. *United States v. Laurienti*, 731 F.3d 967, 972 (9th Cir. 2013).

"Whether conduct extraneous to an offense of conviction is part of the same 'course of conduct' or 'common scheme or plan' as the offense of conviction so as to be considered 'relevant conduct' within the meaning of Guidelines § 1B1.3(a)(2) is reviewed for clear error." *United States v. Hahn*, 960 F.2d 903, 907 (9th Cir. 1992).

The legality of a restitution order, and the district court's valuation methodology, are reviewed de novo. *United States v. Dadyan*, 76 F.4th 955, 958 (9th Cir. 2023). "If the order is within statutory bounds, then the restitution calculation is reviewed for abuse of discretion, with any underlying factual findings reviewed for clear error." *Id.*

If an issue should have been raised below but was not, review is generally for plain error. "Plain error is (1) error, (2) that is plain, and

(3) that affects substantial rights. If these three conditions are met, [this Court] may then exercise [its] discretion to grant relief if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Williams*, 5 F.4th 973, 978 (9th Cir. 2021) (cleaned up).[9]

# VIII. ARGUMENT

## A. The District Court Materially Erred In Its Guidelines Calculation, Warranting Vacatur And Remand For Resentencing

### 1. The district court erred in imposing the obstruction-of-justice enhancement

#### a. The district court failed to make required express findings of falsity, willfulness, and materiality

"To enhance a guidelines sentencing range based on obstruction of justice, which often results in more time served in prison, a district court must make explicit findings that not only did the defendant give false testimony, but also that the falsehoods were willful and material to the criminal charges." *United States v. Castro-Ponce*, 770 F.3d 819,

---

[9] While Avenatti preserved all objections, even assuming the Court concludes the plain error standard applies to any of the below issues, it is satisfied.

823 (9th Cir. 2014). Failure to make such express findings before imposing the obstruction-of-justice enhancement under Guideline 3C1.1 is error requiring vacatur and remand for resentencing. *Id.*

The district court made no such findings before imposing the obstruction-of-justice enhancement here. It simply made a general reference to unspecified prior testimony by Avenatti cited by the government, and an alleged attempt to forge a signature in a bankruptcy proceeding, and commented that the government's submissions "support[ed] application of the enhancement." (1-ER-15-16.) It never found those statements were false, that any falsity was willful on Avenatti's part, or that the statements were material to any proceeding (either the instant or the prior case). The two-level enhancement was thus wrongly imposed and resentencing is required.

> **b.    The district court failed to find Avenatti willfully and materially impeded investigation into the instant offense**

When the obstruction-of-justice enhancement is predicated on misstatements in separate proceedings, it requires a finding by the district court that the defendant "willfully and materially impeded the search for justice in the *instant offense*." *United States v. Luca*, 183 F.3d

1018, 1023 (9th Cir. 1999) (cleaned up); *United States v. Zagari*, 111

F.3d 307, 328 (2nd Cir. 1997). But the district court made no such

finding here. It merely said the prosecution's pleadings supported the

enhancement, which constituted no finding at all. (1-ER-15-16.) The

PSR also made no findings on this issue, because its only discussion of

the obstruction-of-justice enhancement pertained to the tweet regarding

Alexis Gardner, which the district court rejected as a basis for the

enhancement. (7-ER-1579.) The enhancement thus was improper for

this additional reason.

### c.  The evidence failed to establish materiality

The government's evidence was also insufficient to establish the

obstruction-of-justice enhancement's materiality requirement. When

the enhancement rests on testimony given in a separate proceeding, the

required materiality must exist with respect not only to the issues

underlying the criminal prosecution but also those litigated in that

separate proceeding. *United States v. Taylor*, 749 F.3d 842, 847 (9th

Cir. 2014) (bond revocation hearing); *Zagari*, 111 F.3d at 329

(regulatory proceedings). To be material, the testimony must "tend to

influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. n.6.

But the government submitted no evidence to suggest—let alone prove—that the snippets of testimony on which it based its argument for the enhancement were material to the underlying proceedings. It merely cited out-of-context excerpts of testimony Avenatti gave in two prior judgment debtor examinations and a state bar disciplinary hearing, and argued the statements were false. (1-PSR-89-92.) No evidence showed they were material to the issues at hand in those proceedings, or even what the issues *were* that were "under determination" in those proceedings. The government thus failed to meet its burden to establish the enhancement, even if the district court had made the required materiality findings.

### d. Any alleged forgery was not shown to be "with respect to the investigation, prosecution, or sentencing of the instant offense," or intended or likely to thwart its investigation

To the extent the obstruction-of-justice enhancement rested on Avenatti's alleged forgery of his law partner's signature in the EA bankruptcy proceeding, any such forgery also failed to support the enhancement because it was never shown or found to be "with respect

to the investigation, prosecution, or sentencing of the instant offense of conviction" or "related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense," as Guideline 3C1.1 requires.

The alleged forgery occurred in the EA bankruptcy case in December 2017 or January 2018 to obtain a dismissal of that bankruptcy case. (11-ER-2577-2643; 1-PSR-92.) The government made no showing—or even argument—that dismissing the EA bankruptcy case had any relation to the investigation, prosecution, or sentencing for the offenses at issue in *this* case. No evidence or argument suggested the bankruptcy case's dismissal bore on the investigation, prosecution, or sentencing of the offenses to which Avenatti pled guilty. The government's only argument was that a forgery occurred to obtain the dismissal, period. (1-PSR-91-92.)

Nor was the alleged forgery shown to harbor the required mens rea or likelihood of obstruction. Comment note 1 to Guideline 3C1.1 requires that, to qualify for the enhancement, conduct occurring before the start of the investigation into the offenses of conviction must have been "purposefully calculated, and likely, to thwart th[ose offenses']

investigation or prosecution." U.S.S.G. § 3C1.1, cmt. n.1. Here, Avenatti's alleged forgery occurred in December 2017 or January 2018 at the latest—well before much of the conduct at issue in this case had even occurred, and before any evidence suggests the government had begun investigating it. (11-ER-2632-35 (showing dates).) Indeed, a book by a Department of Justice official identifies March 2018 as the beginning of the investigation into Avenatti's instant offenses. (3-PSR-684 (As of Avenatti's March 2019 arrest in a separate case, California authorities "were a year into" the investigation in this case).) Avenatti's alleged December-2017-or-January-2018 forgery thus preceded the investigation's start. No evidence suggested—and the government never argued—that any such pre-investigation forgery was "purposefully calculated, [or] likely," to thwart the not-yet-commenced investigation or prosecution of the offenses in this case.

### e. The obstruction-of-justice enhancement should be reviewed de novo

Avenatti's objections to the obstruction-of-justice enhancement should be reviewed de novo for three reasons. First, Avenatti preserved the issue by objecting to the enhancement in his sentencing memoranda (3-PSR-496-98; 7-PSR-1345-46), objecting at the sentencing hearing

that the district court had failed to make an express "finding that the conduct at issue, specifically perjury, was designed to obstruct justice," (1-ER-71), arguing the statements in prior proceedings were not willful, (7-PSR-1345-46), and arguing "no evidence" showed he "was aware of any ongoing or impending criminal investigation" during the alleged obstructive conduct, or "*willfully* obstructed anything." (7-PSR-1346.) Because the "claim [was] properly presented," Avenatti "can make any argument in support of that claim" on appeal. *United States v. Kirilyuk*, 29 F.4th 1128, 1136 (9th Cir. 2022) (cleaned up).

Second, even apart from those objections, the requirement to make specific findings on falsity, willfulness, and materiality are legal requirements, compliance with which can be reviewed de novo even absent objection below. *United States v. Eckford*, 77 F.4th 1228, 1231-32 (9th Cir. 2023).

Third, even if the Court concludes the plain error standard applies, it is satisfied: the failure to make express findings constitutes plain error, *United States v. Herrera-Rivera*, 832 F.3d 1166 (9th Cir. 2016), Guideline 3C1.1's text and commentary are clear, and the error had a substantial effect on Avenatti's sentence by increasing his

Guidelines range by two levels. *Id.* at 1175. Imposing the enhancement without the required express findings "constitutes reversible plain error even when the sentence imposed falls below the range the Sentencing Guidelines would have recommended absent the enhancement." *United States v. Ruiz*, 2023 WL 6999439 at *2 (9th Cir. Oct. 24, 2023); *see also Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907-08 (2018).

### 2. The district court erred by relying on state law to refuse to deduct attorneys' fees, costs, and prior payments to clients from the loss amount

The district court also committed legal error by interpreting Guideline 2B1.1 to require a $12,350,000 loss amount consisting of the entire amounts of the settlement payments made to the four clients, without subtracting attorneys' fees and costs those victims had agreed they would not receive, or offsetting payments and value Avenatti provided the clients before the fraud was discovered. Had those amounts been subtracted—even without including, for fee purposes, the value of Em or the other assets Avenatti procured for Phan—the ultimate loss amount would have been in the $3,500,000-to-$9,500,000 range, producing an 18-level increase over the base offense level, instead of in the $9,500,000-to-$25,000,000 range on which the district

court relied to apply a 20-level increase. *See* U.S.S.G. § 2B1.1(b)(1)(J)-(L). If Em and the other assets are included for fee purposes, the loss range drops even lower. The legal error thus prejudiced Avenatti, warranting vacatur and remand.

### a. Guideline 2B1.1 requires a net loss approach

Guideline 2B1.1 defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1; cmt. n.3(A)(i). It is not the gross value of the property taken, but rather "net loss" consisting of "the difference between what the victim paid and what the victim recovered plus any other forms of reasonably foreseeable pecuniary harm that resulted from the offense." *United States v. Hartstein,* 500 F.3d 790, 798 n.3 (8th Cir. 2007) (cleaned up); *Laurienti*, 611 F.3d at 557-58 (endorsing net loss approach). To calculate victims' actual losses, courts must "compare what actually happened with what would have happened if [the defendant] had acted lawfully." *United States v. Bussell*, 504 F.3d 956, 964 (9th Cir. 2007) (internal citation omitted); *see also United States v. Gagarin*, 950 F.3d 596, 607 (9th Cir. 2020) (same). The Sentencing Commission adopted this net loss rule in 2003, adding a "credits against

loss" provision deducting from the loss amount "[t]he money returned, and the fair market value of the property returned and services rendered, by the defendant . . . to the victim before the offense was detected." U.S.S.G. § 2B1.1, cmt. n.3(E)(i); *compare* U.S.S.G. App. C., Vol. II, Amend. 617 (setting forth prior version of Guideline), with U.S.S.G. § 2B1.1 (2004).

The 2003 amendment reflected the Sentencing Commission's view that a "net loss" approach "better determine[s]" the "seriousness of the offense and the culpability of a defendant," because "the offender who transfers something of value to the victim[ ] generally is committing a less serious offense than an offender who does not." U.S.S.G. App. C., Vol. II, Amend. 617, page 179; *United States v. Markert*, 732 F.3d 920, 932-33 (8th Cir. 2013) (same).

This Court has uniformly followed that net loss approach. It has required losses of defrauded renters to be offset by the value of their leases, *United States v. Harper*, 32 F.3d 1387, 1392 (9th Cir.1994); losses from unlicensed medical services to be reduced by those services'

value, *United States v. Barnes*, 125 F.3d 1287, 1291 (9th Cir. 1997);[10]

losses from a fraudulent stock scheme to be offset by investors' gains,

*Laurienti*, 611 F.3d at 557-58; and losses from substandard products to

be reduced by "the partial benefit gained by the" recipient. *United*

*States v. West Coast Aluminum*, 265 F.3d 986, 992 (9th Cir. 2001). As

these cases recognize, "a fraud that consists in promising 20 ounces of

gold but delivering only 10 produces as loss the value of 10 ounces of

gold, not 20." *United States v. Mount*, 966 F.2d 262, 265 (7th Cir.1992)

(parenthetically quoted in *Laurienti*).

This credit-against loss rule has also been consistently applied to

fraud committed by attorneys. *United States v. Hausmann*, 345 F.3d

952, 960 (7th Cir. 2003) and *United States v. Marley*, 621 F. App'x 936,

942-43 (11th Cir. 2015) applied the rule to attorney fraud, but found no

---

[10] After *Barnes* and *Maurello* (cited below) were decided, the Sentencing Commission amended § 2B1.1 to prohibit credits against loss when services are fraudulently rendered by individuals falsely posing as licensed professionals—as happened in those cases. U.S.S.G. § 2B1.1 cmt n. 3(F)(v). If any violation of state rules of professional responsibility were sufficient to obviate the credit-against-loss rule, as the district court held, there would have been no reason for the Sentencing Commission to adopt this exception for false professional certification, which necessarily results in an ethical breach.

payments to deduct. In *United States v. Maurello*, 76 F.3d 1304, 1312 (3d Cir. 1996), *superseded by rule on other grounds as stated in United States v. Aronowitz*, 151 F. App'x 193, 194 (3d Cir. 2005), the Third Circuit held a disbarred attorney who provided unauthorized legal services should only have been assessed losses for clients who were dissatisfied. And in *United States v. Conner*, 811 F. App'x 787, 792-93 (3d Cir. 2020), the Third Circuit held that the district court should have deducted payments made to the victim by the defendant—her attorney-in-fact—before the fraud's discovery.

### b. The district court contravened Guideline 2B1.1 by importing inapplicable principles of state law

The district court contravened all of those precedents when it refused to apply the net loss approach here. Instead, it invented a novel, extratextual, and state-dependent exception to the net loss rule for attorney defendants—unsupported by anything in Guideline 2B1.1—whereby loss cannot be offset by the value of property returned or services rendered when a defendant attorney commits fraud in connection with professional services, and the law of the relevant state limits attorneys' ability to recover fees for such services in a civil

context. In doing so, the district court disregarded Guideline 2B1.1's text and "net loss" approach, imported inapplicable state-specific provisions that will necessarily vary across (and even within) different federal jurisdictions, and arrived at an inflated loss calculation that included vast sums that the clients never would have obtained even had no fraud occurred, as well as amounts paid to the clients before the fraud was detected. This was error in numerous respects.

> **(1)** **The district court's state-law-based exception contravenes the plain meaning of "loss" in Guideline § 2B1.1**

When a Guideline's text is plain and unambiguous, it must be followed. *Kisor v. Wilke*, 139 S.Ct. 2400, 2415, 2418 (2019) (addressing unambiguous agency regulations); *United States v. Castillo*, 69 F.4th 648, 658 (9th Cir. 2023). Though § 2B1.1 does not define "loss," dictionary definitions "make . . . clear" that it is "a fact-specific amount," "driven by the amount of loss caused by the crime," and "cannot mean a pre-determined, contrived amount with no connection to [that] crime." *Kirilyuk*, 29 F.4th at 1138 (cleaned up).

The district court defied those principles by redefining "loss" to include amounts the clients did not actually lose, based on state-law

civil cases that do not define "loss" at all. None of the California cases on which the district court relied attempts to quantify loss or harm to victims. Rather, each involves the separate and independent question of whether deterrence and public policy permit, in a *civil* context, the award of fees to attorneys who have breached their ethical duties. Indeed, one of the cases on which the district court relied[11] explicitly says "*it is irrelevant whether [the client] suffered damage*," because the California fee-forfeiture rule instead focuses on the "public policy" of "deter[ing]" attorney misconduct. *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 198 Cal. Rptr. 3d 253, 274 (2016) (emphasis added). Others simply permit courts to deny fees, as a punishment, when attorneys commit fraud. *Clark v. Millsap*, 197 Cal. 765, 785 (Cal. 1926); *Rodriguez v. Disner*, 688 F.3d 645, 655 (9th Cir. 2012). The Restatement (Third) of Law Governing Lawyers § 37—on which the district court also relied, (1-ER-12)—similarly differentiates the "deterrent" of fee forfeiture from quantification of clients' losses, saying "[t]he damage that misconduct causes is often difficult to assess"

---

[11] *See* 1-ER-12 n.4; 7-PSR-1574 n.15.

and courts "often can determine a forfeiture sanction more easily than a right to compensating damages." Restatement (Third) of Law Governing Lawyers, § 37, cmt. b.

As these authorities show, California's public policy and deterrence interests when its attorneys sue for fees has nothing to do with calculating "loss" to victims for purposes of the federal Sentencing Guidelines. Section 2B1.1 does not seek to enforce ethical norms; it instead presupposes a fraud has occurred, and attempts to quantify the resulting net harm. That a defendant has breached an ethical norm cannot be an exception to that method of calculation, because a breach of duty is already built into § 2B1.1's analysis. The fact that, as a punishment, a lawyer may forfeit fee compensation under California law *after committing fraud* is irrelevant to § 2B1.1's inquiry into the difference between what the client actually received and what the client would have received *had no fraud been committed*.

> **(2)** **The district court created an unwarranted exception, at odds with § 2B1.1's commentary**

The district court's reliance on California civil law to include Avenatti's fees, costs, and payments to clients in the loss amount also

reads an unwarranted exception into Guideline 2B1.1's commentary, which defines "actual loss" as "reasonably foreseeable pecuniary harm that resulted from the offense," with no exception for attorney fraud or state law. U.S.S.G. § 2B1.1, cmt. n.3(A)(i). The commentary expressly provides for credit against loss with no exception for attorney fraud—let alone exceptions based on state law. U.S.S.G. § 2B1.1, cmt. n.3(E)(i). Notably, the Sentencing Commission has adopted *other* exceptions to the credit-against-loss rule, stating that loss cannot be offset by "the value of th[e] items or services" rendered in cases involving services by people posing as licensed professionals or goods falsely represented to have government approval or agency certification. U.S.S.G. § 2B1.1, cmt. n.3(F)(v). But it created no corresponding exception for fraud by professionals who do not misrepresent their professional licensure.

When interpreting a statute, Congress's "inclu[sion of] particular language in one section of a statute but omi[ssion of] it in another section of the same Act" gives rise to a "general[] presum[ption] that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States v. Marschall*, 82 F.4th 774, 782 (9th Cir. Sept. 20, 2023) (cleaned up). The same statutory interpretation rules apply to

the Sentencing Guidelines. *United States v. Herrera*, 974 F.3d 1040, 1047 (9th Cir. 2020). Here, the Sentencing Commission's choice to create an express exception from the credit-against-loss rule for individuals posing as licensed professionals and falsely certifying goods—but no similar exception for attorney fraud—should lead to the same conclusion. The exceptions for false-licensing and certification cases show the Sentencing Commission acted intentionally by not providing a similar exception for fraud by attorneys. The district court erred by creating one from whole cloth.

### (3) The exception violates the net loss concept and Circuit law that value can be rendered even amid fraud

The district court's refusal to reduce the loss amount by contractually-agreed fees and costs, and payments to clients, also contravenes the net-loss concept at the heart of Guideline 2B1.1. The Guideline's entire approach "is driven by the amount of loss *caused by the crime.*" *Kirilyuk*, 29 F.4th at 1138 (cleaned up). Losses must be "reasonably foreseeable" to the defendant, U.S.S.G. § 2B1.1, cmt. n.3(a)(1), based on "a realistic, economic approach to determining what

losses the defendant truly caused." *United States v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996) (cleaned up).

As Avenatti argued during the sentencing hearing, his contracted-for attorneys' fees and costs were not properly part of the § 2B1.1 loss, because it was not reasonably foreseeable to Avenatti that taking those amounts would cause the clients harm, given that they would not have obtained those amounts even had Avenatti acted lawfully. (1-ER-65-66.) On the contrary, all four clients' retainer agreements entitled Avenatti to deduct an attorney's fee, and Johnson, Gardner, and Barela additionally agreed he could recoup costs and expenses. (11-ER-2430-31, 2466, 2525, 2553.) Nor was it reasonably foreseeable to Avenatti that the clients would suffer pecuniary harm to the extent of amounts he had previously advanced and paid directly *to* them (such as for living expenses).

Including attorneys' fees, costs, and expenses in loss also contradicted this Court's definition of "actual loss" as the difference between what the clients would have had absent the fraud and what they were left with after it occurred. *Gagarin*, 950 F.3d at 607. The clients would not have obtained Avenatti's attorneys' fees, costs, or

expenses even absent the fraud, because they contracted otherwise. Including those amounts in actual loss was therefore a fiction: it posited that the clients would have obtained amounts they expressly agreed they would not. Certainly, it is not a "realistic, economic approach" to treat them as amounts the clients would have obtained absent the wrongdoing. *Allison*, 86 F.3d at 943.

Nor can the district court's no-offsets-for attorney-fraud rule be squared with Guideline 2B1.1's foundational concept that "the offender who transfers something of value to the victim[ ] generally is committing a less serious offense than an offender who does not." U.S.S.G. App. C., Vol. II, Amend. 617, page 179. The district court's approach flatly ignores this concept: an attorney who took a client's $2 million settlement, but paid $1.5 million back into the client's account before the fraud was discovered, would receive the same offense level as an attorney who took the entire $2 million and paid none of it back. An attorney who stole a client's funds but who had paid her rent for three years before the theft came to light would have the same offense level as one who just took the money outright. Such one-size-fits-all calculations

contravene the Sentencing Commission's directive to calibrate punishment to blame.

### (4) The district court's novel state-specific exception would lead to uneven application

Finally, the district court's state-law-based exception to § 2B1.1's net loss approach would create unworkable variations in the Guideline's application depending on the state in which the offense occurred, due to states' varying approaches to attorney fee forfeiture. The district court described the California rule it applied as being that "[f]raud or unfairness on the part of an attorney <u>will prevent him from recovering for services rendered</u>." (1-ER-12.) But even assuming that is a correct statement of California law—*which it is not*[12]—other states take different approaches. New York, for instance, allows attorneys to recover their fees despite an ethical breach, except for the period of disloyalty.[13] Washington and Missouri limit fee forfeiture to egregious

---

[12] *See* Section VIII(A)(2)(5), below.

[13] *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 840 (2d Cir. 1993) ("Under New York law, attorneys may be entitled to recover for their services, even if they have breached their fiduciary obligations.")

misconduct,[14] whereas Florida deems fee forfeiture not necessarily appropriate even for "serious transgressions," and considers attorney discipline more appropriately left to the state bar disciplinary process.[15] States also differ as to whether forfeiture can be ordered absent harm to the client, *see* Restatement (Third) of the Law Governing Lawyers § 37, Reporter's Note, cmt. d (summarizing cases on both sides), whether forfeiture can be ordered when the attorney lacked knowledge that the conduct was wrong, *id.*, and the extent of the forfeiture. *Id.*, Reporter's Note, cmt. e.

Injecting state fee recovery law into § 2B1.1's loss calculation would require federal courts to apply this range of disparate state rules in determining whether to offset losses for attorneys' fees for identical

---

[14] *Spencer v. Badgley Mullins Turner PLLC*, 432 P.3d 821, 841 (Wash. Ct. App. 2018) (fee disgorgement limited to "egregious" instances); *Internat'l Mat'ls Corp. v. Sun Corp., Inc.*, 824 S.W. 2d 890, 895 (Mo. 1992) (complete fee forfeiture only for "clear and serious violation[s]").

[15] *Searcy, Denney, et. al v. Scheller*, 629 So. 2d 947, 951-54 (Fla. App. 1993); *see also Fairfax Sav., F.S.B. v. Weinberg & Green,* 112 Md. App. 587, 628 (1996) (Maryland law firm was not obligated to disgorge entire fee because firm rendered valuable legal services, and damages and sanctions would be adequate.)

instances of attorney misconduct, leading to disparate sentences for similarly-situated fraud defendants. For precisely that reason, both the Supreme Court and this Court have held that "the meaning of [a] federal statute should not be dependent on state law," absent "a plain indication" of Congressional intent otherwise. *United States v. Turley*, 352 U.S. 407, 411 (1957); *see also Taylor v. United States*, 495 U.S. 575, 590-91 (1990) (rejecting a state-specific "burglary" interpretation for federal career offender statute, which would cause defendants in different states to "receive a [different] sentence enhancement based on exactly the same conduct"); *United States v. Reza-Ramos*, 816 F.3d 1110, 1127-28 (9th Cir. 2016) (declining to adopt a state-specific definition of "burglary" in 18 U.S.C. § 1111); *United States v. James*, 810 F.3d 674, 679-81 (9th Cir. 2016) (declining to incorporate state definition of "physically helpless" into the definition of "physical incapable" under federal rape statute). Because nothing in § 2B1.1 suggests the Sentencing Commission—or Congress— intended to

incorporate state civil law into the federal determination of "loss," the district court erred by reaching out to do so.[16]

> ### (5)  Even if California law were relevant, the district court misapplied it

Even assuming California fee recovery law could have some relevance in the Guideline analysis, the district court misapplied it. The district court characterized California law as being that an attorney's fraud "<u>will prevent him from recovering for services rendered</u>." (1-ER-12.) But in fact, California law clearly provides that even attorneys who breach ethical duties may still be entitled to recover in quantum meruit for the reasonable value of their services, as well as their out-of-pocket costs and advances to the client. *See, e.g., Hance v. Super Store Indust.*, 44 Cal. App. 5th 676, 689-90 (2020); *Sheppard, Mullin, Richter & Hampton LLP v. J-M Mfg. Co., Inc.*, 6 Cal. 5th 59, 91-93 (2018) (same).

Moreover, Avenatti was not only permitted but *required* by California law to deduct his fees, costs, and any advances previously made to the clients as soon as the settlement payments were received.

---

[16] Though the Guidelines are drafted by the Sentencing Commission, they are subject to Congressional review and approval. *See Kirilyuk*, 29 F.4th at 1136.

Cal. R. Prof. Conduct 1.15(c)(2);[17] As of the time he took those amounts, therefore, no crime or fraud had yet occurred. Any losses to the clients were thus necessarily limited to any funds remaining after those initial deductions were made. *See, e.g., Cal. Pak Delivery, Inc. v. United Parcel Service, Inc.*, 52 Cal. App. 4th 1, 15-16 (1997) (attorney fee forfeiture limited to time period after the ethical breach); *Jeffry v. Pounds*, 67 Cal. App. 3d 6, 12 (1997) (same).

### c. The error prejudicially impacted Avenatti's Guidelines range, warranting vacatur and remand

The district court's loss calculation was not harmless because it improperly added at least two, and likely four, levels to Avenatti's offense level under Guideline 2B1.1(b)(1).

The district court assessed a loss amount of $12,350,000, based on the gross settlement amounts for each client. (1-ER-12.) But the government conceded at sentencing that offsetting Avenatti's attorneys' fees, costs, expenses, and payments to Gardner, Johnson, and Barela

---

[17] Johnson's, Gardner's, and Barela's agreements similarly required fees to be taken from the "initial lump-sum payment." (11-ER-2430-31, 2466-67, 2525-26.)

would have produced a net loss amount of no more than $7,603,564. ($1,572,092 for Johnson (1-PSR-131), $1,432,585 for Gardner (1-ER-51; 8-PSR-1646 n.10); $598,887 for Barela (1-PSR-134), and $4 million for Phan (1-PSR-135.).) Those reductions alone would have decreased Avenatti's offense level enhancement from 20 levels for loss between $9,500,000-$25,000,000 (applied by the court) to 18 levels for a loss amount between $3,500,000-$9,500,000. U.S.S.G. § 2B1.1(b)(1)(J)-(K). Taking into account the base level of 7 and 12 levels of other enhancements applied by the court, minus two levels for acceptance of responsibility, the offense level would drop from 37 to 35, changing the Guidelines range from 262-327 months to 210-262 months.

But the loss amount should also have been further reduced by the $4,000,000 attributed to Phan, resulting in a total four-level decrease in Avenatti's offense level—from 20 levels for loss between $9,500,000-$25,000,000 to 16 levels for loss between $1,500,000-$3,500,000. This would have reduced his Guidelines range from the 262-327-month range the district court applied to 168-210 months. Avenatti argued at sentencing—and the government did not contest—that if his 7.5 percent attorney fee for Phan's case included the value of Em, that fee for Em

would exceed $4 million. (2-ER-160-62, 165; 3-PSR-494.) The district court, however, wrongly found that Avenatti's 7.5 percent attorney fee did not extend to Em's value at all, because obtaining Em was "other additional unrelated work" not "covered by his contract[]" with Phan, separate from Avenatti's work negotiating Ipsy's buyback of Phan's shares.[18] (1-ER-23, 52.) That finding was clearly erroneous because it was contradicted by all the evidence in the record. *United States v. Spangle*, 626 F.3d 488 (9th Cir. 2010) (factual findings are clearly erroneous if "without support in the record.") Phan, Tran and Marchino all testified that obtaining Em was "part of the deal" Phan hired Avenatti to negotiate. Avenatti's retainer agreement shows he was retained by Phan to procure not only the cash settlement from Ipsy but generally "in connection with [Phan's] affirmative claims, divestiture, and exit" from the company. (11-ER-2553.) Phan herself testified that she simultaneously wanted to leave Ipsy and acquire Em, and hired Avenatti to accomplish *both* of those goals in his representation. (3-ER-

---

[18] This finding was made only as to restitution because, as explained, the district court refused to allow any offsets as to the loss amount.

447, 492.) And in negotiating with Tran over the retainer agreement, Avenatti specifically bargained for a broad definition of the "Recovery" from which his fee would be drawn: not just "cash" received for shares, but also "the fair market value of any *benefit, refund, carried interest, business accommodation, loan, and/or funding received in connection with*" Phan's exit from Ipsy. (11-ER-2553) (emphasis added). Em was precisely such a "benefit" and "business accommodation," and its value was thus part of the "Recovery" from which Avenatti was entitled to deduct his 7.5 percent fee. The district court clearly erred in finding otherwise. As Avenatti argued (having participated in the Ipsy negotiations for Em) that Em's value was over $58 million, his corresponding 7.5 percent fee would be at least $4.35 million: more than the $4 million loss attributed to Phan.

### 3. The district court double-counted the alleged omissions and misrepresentations in EA bankruptcy proceedings under both the bankruptcy-misrepresentation and obstruction-of-justice enhancements[19]

The district court additionally abused its discretion by applying two different enhancements—the misrepresentations-in-bankruptcy enhancement under U.S.S.G § 2B1.1(b)(9) and the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1—based on Avenatti's same alleged omissions and misrepresentations in the EA bankruptcy proceedings. "Impermissible double counting occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Holt,* 510 F.3d 1007, 1011 (9th Cir.2007).

Here, the type of harm targeted by the two enhancements is the same: misrepresentations that allegedly impaired the bankruptcy court's ability to value EA's assets and compensate its creditors. Commentary to the misrepresentation-in-bankruptcy enhancement

---

[19] Avenatti objected to this error below. (1-ER-62.)

specifically forbids imposing it simultaneously with the obstruction-of-justice enhancement, where both are based on misrepresentations to a bankruptcy court. *See* U.S.S.G. § 2B1.1, cmt. n.8(E)(ii). The district court's violation of that rule constituted an abuse of discretion; indeed, the probation office expressly did *not* include the bankruptcy statements as a basis for the obstruction-of-justice enhancement. (7-ER-1579.)

### 4. The Guideline calculation errors warrant vacatur and remand for resentencing.

"If the district court makes a material miscalculation in the advisory guidelines range, [this Court] must vacate the sentence and remand for resentencing." *United States v. Berger*, 587 F.3d 1038, 1041 (9th Cir. 2009) (cleaned up). Here, the above Guidelines-calculation errors resulted in Avenatti receiving an unwarranted two levels for obstruction of justice, another unwarranted two levels for the misstatements-in-bankruptcy enhancement, and at least four unwarranted levels due to overcalculation of the loss amount under § 2B1.1. Without those eight levels, his offense level would have been 29 instead of 37, resulting in a Guidelines range of 108-135 months instead of the 262-327-month range the court applied. Avenatti's 168-month

sentence far exceeds even the high end of that range. Moreover, the district court granted a substantial four-level downward variance from the 262-327-month range it employed—such that it likely would have varied down from the reduced range as well. But regardless, the district court's use of the wrong range requires vacatur and remand in itself. "When a defendant is sentenced under an incorrect Guidelines range— whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016).

## B. The District Court Abused Its Discretion By Denying An Evidentiary Hearing As To The Loss Amount

When a reasonable dispute exists as to a sentencing factor, the defendant must "be given an adequate opportunity to present information to the court" regarding it, and "to demonstrate the lack of reliability of the government's proof." U.S.S.G. § 6A1.3(a); *United States v. Williams*, 41 F.3d 496, 501 (9th Cir. 1994). "An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues" regarding loss. U.S.S.G. § 6A1.3, Commentary.

Here, the parties' positions regarding the loss amount varied widely. The government contended the loss was $12,350,000—resulting in a 20-level increase above the base level of 7, U.S.S.G. § 2B1.1(b)(1)(K)—such that the total offense level under § 2B1.1 (without other enhancements) was 27, and was 39 with the 12 additional enhancement points. Avenatti, by contrast, contended that the loss was between $1,500,000 and $3,500,000, resulting in a 16-level loss enhancement. U.S.S.G. § 2B1.1(b)(1)(I); 2-ER-151; 3-PSR-494. The parties' differing positions as to the loss amount thus accounted for four offense levels, or the difference between a Guidelines range of 168-210 months (offense level 33) and the 262-327-month range the court utilized (offense level 37). U.S.S.G. ch. V, Sentencing Table.

The district court nevertheless denied an evidentiary hearing on the basis that—because a trial had occurred—"the necessary evidentiary hearing has already been conducted." (1-ER-126.) That was clearly incorrect. First, the granting of a mistrial rendered the trial a nullity, "vacating the former judgment" and leaving the parties "in the same situation as if no trial had ever taken place." *United States v. Jimenez Recio*, 371 F.3d 1093, 1105 n.11 (9th Cir. 2004) (cleaned up).

Second, as the district court acknowledged, (2-ER-269 lines 3-4), Avenatti was never permitted to finish his defense case at trial due to the court declaring a mistrial midway through it. Third, the trial did not encompass litigation of the loss amount in any event—let alone the value of Em Cosmetics—but instead pertained to Avenatti's guilt or innocence of wire fraud. The loss amount became relevant only after Avenatti's guilty plea, at sentencing.

Because the district court applied an incorrect rationale for denying the evidentiary hearing—that a trial had already taken place as to guilt—and years of sentencing time were at stake based on numerous disputed sentencing facts, the district court's denial of an evidentiary hearing constituted an abuse of discretion warranting vacatur and remand. *United States v. Jimenez Martinez*, 83 F.3d 488, 494-95 (1st Cir. 1996) (abuse of discretion to deny evidentiary hearing to resolve "clear dispute over reliability" of affidavit on which years of sentencing time hinged).

**C.** **The District Court Wrongly Applied a Preponderance-of-the-Evidence Standard to Enhancements that Increased Avenatti's Offense Level by 32 Levels**

The district court further erred by finding the facts underlying the government's combined 32 levels of enhancements by only a preponderance of the evidence, instead of the more demanding clear-and-convincing standard required for facts "an extremely disproportionate effect on the sentence." *United States v. Garro*, 517 F.3d 1163, 1168 (9th Cir. 2008) (cleaned up). (1-ER-17) (district court expressly finding each enhancement "by a preponderance of the evidence").[20] Clear-and-convincing evidence is required when sentence enhancements rest on conduct or harm outside that for which the defendant was convicted and increase the offense level by four or more levels or double the Guidelines range. *United States v. Lonich*, 23 F.4th 881, 911-16 (9th Cir. 2022).

Those factors are squarely applicable here. First, the district court's findings underlying Avenatti's 32 levels of disputed

---

[20] Avenatti preserved this issue. (1-ER-62, 70-71; 3-ER-493.)

enhancements[21]—that Avenatti caused $12,350,000 in loss, that the victims were vulnerable and suffered substantial financial harm, that the scheme was complex, and that Avenatti made false statements in separate court proceedings—were not facts of which Avenatti was convicted or to which he pled. He was convicted of defrauding Gardner, Phan, Johnson, and Barela, and sending the four wire transmissions described in the four wire fraud counts of the Indictment to which he pled guilty. (2-ER-186-95; 11-ER-2388-89.) There was also a "substantial intermediate causation question," *Lonich*, 23 F.4th at 915, whether Avenatti caused the enormous loss amount used by the court— $12,350,000—given that much of that loss consisted of amounts the clients never expected to receive (such as attorneys' fees and costs), or actually *did* receive (such as amounts Avenatti paid them). Whether Avenatti's conduct caused Phan to lose $4 million she would otherwise have obtained was also highly doubtful, given that Avenatti's retainer agreement expressly said he would obtain 7.5 percent of the value of

---

[21] The Court considers disputed enhancements' "cumulative effect." *Lonich*, 23 F.4th at 911.

any business asset he obtained for Phan, and Em was just such an asset. (*See* section VIII(A)(2)(c), above.)

Finally, the 32 levels of enhancements had an extremely disproportionate impact on Avenatti's sentence. Even assuming a proper loss calculation (accounting for offsets) would still have resulted in an 18-level enhancement over the base level of 7 (for between $3.5 and $9.5 million), *see* section VIII(A)(2)(c), above, an additional 12 levels still resulted from the district court's application of the other enhancements requested by the government. At criminal history category III, that 12-level increase elevated Avenatti's Guidelines range from 70-87 months (offense level 25) to 262-327 months (offense level 37):[22] an increase of at least 192 months or 16 years.

Nor was the error harmless, because the court might have found the clear-and-convincing standard unmet given the errors in its loss analysis and the tenuousness of the obstruction-of-justice and bankruptcy-misstatement enhancements. *Molina-Martinez*, 578 U.S. at

---

[22] This takes account of the two-level reduction for acceptance of responsibility the district court applied.

194 (prejudice requires reasonable probability of a different outcome

absent the error).

**D.  The District Court Clearly Erred by Concluding the New York Cases were not Relevant Conduct Requiring Concurrent Sentencing**

The district court further abused its discretion in failing to find

Avenatti's New York cases were relevant conduct to this case, so as to

require concurrent sentencing under Guideline 5G1.3(b).[23] (1-ER-22).

When a defendant has a term of imprisonment resulting from

another offense that is relevant conduct, the court "shall adjust the

sentence for any period of imprisonment already served on the

undischarged term of imprisonment"—if it will not be credited to the

federal sentence by the Bureau of Prisons—and impose the sentence

"concurrently to the remainder of the undischarged term" on the other

offense. U.S.S.G. § 5G1.3(b)(1)-(2).

By the time of sentencing in this case, Avenatti was already

serving prison sentences imposed in two separate federal criminal cases

---

[23] Avenatti does not concede his guilt in either of the New York cases, which are currently pending on appeal. He discusses them here because the district court, at sentencing, was required to rely on the fact of those convictions.

in the Southern District of New York.[24] The first, charging extortion and honest-services fraud, involved allegations that Avenatti—in March 2019—threatened the Nike sportswear company with reputational and financial injury if it did not pay him money, and deprived client Gary Franklin of his honest services by (unbeknownst to Franklin) conditioning a settlement between Franklin and Nike on Avenatti's receipt of that money. *United States v. Avenatti*, 8 F.4th 171, 175-83 (2nd Cir. 2023) (the "Nike case"). Avenatti allegedly did these things to improve the then-precarious financial situation of EA. *Id.* at 177. In July 2021 he was sentenced to 30 months. (7-PSR-1585.)

The second New York case involved charges of wire fraud and aggravated identity theft stemming from allegations that Avenatti— between July 2018 and February 2019—misappropriated funds sent by

---

[24] The three prosecutions appear to have been deliberately timed to maximize Avenatti's sentencing exposure even though—as the probation office acknowledged—at least the New York matters "could have been combined into one criminal case." (7-PSR-1544; *see also* 3-PSR-684-85 (United States Attorneys for the Southern District of New York and Central District of California coordinated the timing of Avenatti's arrests).) Instead, Avenatti was separately charged in all three cases within just over two months, and underwent three sentencings within eighteen months. (1-ER-2; 11-ER-2369; 7-PSR-1585-87.)

a book publisher to his client, Stephanie Clifford, by having them wired to an EA trust account, using them for his own purposes, and not telling Clifford the funds had been paid (the "Clifford case"). (*See United States v. Avenatti*, 2nd Cir. case no. 22-1242, Dkt. 59, Appellant's Opening Brief, at 3-19.) As in this case, Avenatti allegedly responded to Clifford's inquiries about where the funds were by saying they had not yet been received. (*Id.* at 11-13.) The government also alleged that Avenatti used some portion of the money for payroll and other expenses of EA, which was in financial difficulty. (*Id.* at 14 n.8.) In June 2022, Avenatti was sentenced to four years. (7-PSR-1587.)

Relevant conduct encompasses "all acts and omissions" by the defendant "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. §§ 1B1.3(a)(1)(A), (a)(2); 3D1.2(d). To constitute the "same course of conduct," the acts must be "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, cmt. n.5(B)(ii). Relevant factors "include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between [them]." *Id.*

To constitute a "common scheme or plan," the acts "must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3, cmt. n.5(B)(i).

The district court summarily determined "[t]he fraud counts [in this case] were not part of a common scheme or contemporaneous" with the New York cases and that "[n]one of the factors in the commentary to Section 5G1.3 counsel against a consecutive sentence." (1-ER-22.) But that finding was clearly erroneous because the three cases clearly comprised a common purpose and similar modus operandi, and were contemporaneous. The purpose of all of the conduct was for Avenatti to obtain funds to keep his law firm, EA, afloat when it was in bankruptcy and having financial difficulties. The modus operandi was virtually identical in this case and the Clifford case: having money meant for clients wired to an EA client trust account, diverting it for other purposes, and telling the client the money had not been paid. Avenatti even allegedly made a partial payment to Clifford, in the same way he

made partial payments to Barela, Gardner, and Johnson in this case.[25] The time periods also overlap: the events in this case spanned January 2015 through March 2019, while the Clifford conduct occurred between July 2018 and February 2019 and the Nike conduct took place in March 2019. (7-PSR-1544.)

Given these similarities, the district court clearly erred in concluding that the fraud counts "were not part of a common scheme or contemporaneous" and it was required to impose concurrent sentences under Guideline 5G1.3(b). If anything, the Clifford and Nike cases are just as related to the events of this case as the incidents involving the various clients in this case are to each other. The connection between Johnson and Phan is no different, or closer, than the connection between Johnson and Clifford: the connection consists of the clients being subjected to a similar type of fraud, pursuant to the same modus operandi, for the same purpose. Indeed, the government itself characterized all three cases as "similarly involv[ing] defendant's violations of his duties as a lawyer by lying to and betraying his clients

---

[25] *United States v. Avenatti*, 2nd Cir. case no. 22-1242, Dkt. 59, Appellant's Opening Brief, at 12-13.

for his own personal benefit." (1-PSR-109.) The probation office sensibly recommended that the counts be sentenced concurrently, (7-PSR-1545), and the district court should have done so.

## E. The District Court Failed to Address Nonfrivolous Mitigating Arguments

A district court's failure to address a defendant's non-frivolous arguments in favor of a lower sentence constitutes an abuse of discretion. *See, e.g., United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013); *United States v. Emmett*, 749 F.3d 817, 821 (9th Cir. 2014). Here, the district court failed to address or acknowledge numerous nonfrivolous arguments by Avenatti that bore directly on section 3553's factors, "even to dismiss them in shorthand," *Trujillo*, 713 F.3d at 1010: an error warranting vacatur and remand. It made no mention of Avenatti's substantial assistance to law enforcement in arresting and convicting notorious child sexual predator R. Kelly (at personal expense and despite risk to his and his family's safety), and substantial assistance to the government in another critical criminal prosecution relating to defective personal protective equipment, (5-PSR-824-1040); exemplary conduct while in prison, minimal assessed risk of recidivism, age upon release, participation in the Bureau of Prisons' RDAP

program, or assistance with a suicide-prevention initiative in custody, (3-PSR-471-74); the government's spoliation of mitigation evidence during the case, (3-PSR-474-75); the New York judges' findings that Avenatti was a devoted father and husband who had substantially helped his clients, (3-PSR-464-65); or Avenatti's detailed showing of gross disparities between the sentence in this case and those imposed in cases with comparable or more egregious facts and loss amounts. (3-PSR-465, 511-19.) These factors were too significant for the district court to have ignored and not addressed, in violation of this Court's precedents.

## F. The District Court Clearly Erred in its Restitution Calculation

The district court clearly erred in its restitution calculation—totaling $7,603,564.00—by denying Avenatti an offset for the value of Em and other assets he obtained for Phan, pursuant to the clause in his retainer agreement entitling him to a contingent fee of 7.5 percent of those assets. It constitutes clear error for a district court to fail to offset from the restitution award amounts the victim received from the fraudulent transaction. *United States v. Matsumaru*, 244 F.3d 1092, 1108-09 (9th Cir. 2001).

As discussed, the district court denied the offset based on its finding that Avenatti's argument as to Em and other assets constituted "a claim for other work not associated with the second part of the $8,146,000 payment," and "unrelated work" separate from the Ipsy buyback. (1-ER-23.) That finding was erroneous as explained in Section VIII(A)(2)(c), above. Because all the evidence showed Em *was* "related" to—indeed, and integral part of—the work encompassed by Avenatti's retainer agreement, the government failed to satisfy its burden of proving the restitution amount should include money to which Avenatti was facially entitled as part of his 7.5 percent fee from the value of Em and other business assets he obtained for Phan. *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013).

"Remand is appropriate where the restitution award lacks an adequate evidentiary basis and the district court failed to explain its reasoning." *United States v. Begay*, 33 F.4th 1081, 1097 (9th Cir. 2022) (en banc). As restitution is limited to victims' actual losses, *Anderson*, 741 F.3d at 951, and requires an offset for "any value of the services or items received by the victim," *United States v. Moran*, 778 F.3d 942, 985 (11th Cir. 2015), this Court should vacate and remand for recalculation

of the restitution award taking into account the value of Em Cosmetics

and other assets Phan obtained through Avenatti's representation.

## IX.  CONCLUSION

For the foregoing reasons, Avenatti respectfully requests that this

Court vacate his sentence and remand for a full resentencing on an

open record. *United States v. Matthews*, 278 F.3d 880, 882 (9th Cir.

2002) (en banc).

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender


DATED: November 3, 2023     By  */s/ Margaret A. Farrand*
MARGARET A. FARRAND
Deputy Federal Public Defender
Attorney for Defendant-Appellant

# INDEX OF ADDENDUM

United States Sentencing Guidelines § 1B1.3 ...................................1A

United States Sentencing Guidelines § 2B1.1 ...................................3A

United States Sentencing Guidelines § 3C1.1 ...................................11A

United States Sentencing Guidelines § 5G1.3 ...................................14A

United States Sentencing Guidelines § 6A1.3 ...................................16A

Restatement (Third) of the Law Governing Lawyers, § 37 ..............17A

⚑ KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by   U.S. v. Booker,   U.S.,   Jan. 12, 2005

United States Code Annotated
    Federal Sentencing Guidelines (Refs & Annos)
        Chapter One. Introduction, Authority, and General Application Principles (Refs & Annos)
            Part B. General Application Principles

USSG, § 1B1.3, 18 U.S.C.A.

§ 1B1.3. Relevant Conduct (Factors that Determine the Guideline Range)

Currentness

**(a) Chapters Two (Offense Conduct) and Three (Adjustments).** Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

   **(1)(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

   **(B)** in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were--

      **(i)** within the scope of the jointly undertaken criminal activity,

      **(ii)** in furtherance of that criminal activity, and

      **(iii)** reasonably foreseeable in connection with that criminal activity;

      that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

   **(2)** solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

   **(3)** all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

   **(4)** any other information specified in the applicable guideline.

both counts. Therefore, subsection (a)(2) applies and the total amount of cocaine (45 grams) involved is used to determine the offense level.>

<**(B) "Same Course of Conduct or Common Scheme or Plan."**--"Common scheme or plan" and "same course of conduct" are two closely related concepts.>

   <**(i) Common scheme or plan.** For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of modus operandi (the same or similar computer manipulations were used to execute the scheme).>

   <**(ii) Same course of conduct.** Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).>


<**(C) Conduct Associated with a Prior Sentence.**--For the purposes of subsection (a)(2), offense conduct associated with a sentence that was imposed prior to the acts or omissions constituting the instant federal offense (the offense of conviction) is not considered as part of the same course of conduct or common scheme or plan as the offense of conviction.>

<**Examples:** (1) The defendant was convicted for the sale of cocaine and sentenced to state prison. Immediately upon release from prison, he again sold cocaine to the same person, using the same accomplices and modus operandi. The instant federal offense (the offense of conviction) charges this latter sale. In this example, the offense conduct relevant to the state prison sentence is considered as prior criminal history, not as part of the same course of conduct or common scheme or plan as the offense of conviction. The prior state prison sentence is counted under Chapter Four (Criminal History and Criminal Livelihood). (2) The defendant engaged in two cocaine sales constituting part of the same course of conduct or common scheme or plan. Subsequently, he is arrested by state authorities for the first sale and by federal authorities for the second sale. He is convicted in state court for the first sale and sentenced to imprisonment; he is then convicted in federal court for the second sale. In this case, the cocaine sales are not separated by an intervening sentence. Therefore, under subsection (a)(2), the cocaine sale associated with the state conviction is considered as relevant conduct to the instant federal offense. The state prison sentence for that sale is not counted as a prior sentence; see § 4A1.2(a)(1).>

<Note, however, in certain cases, offense conduct associated with a previously imposed sentence may be expressly charged in the offense of conviction. Unless otherwise provided, such conduct will be considered relevant conduct under subsection (a)(1), not (a)(2).>

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by   *United States v. Rodriguez,*   5th Cir.(Tex.),   Feb. 28, 2020

> United States Code Annotated
>   Federal Sentencing Guidelines (Refs & Annos)
>     Chapter Two. Offense Conduct (Refs & Annos)
>       Part B. Basic Economic Offenses
>         1. Theft, Embezzlement, Receipt of Stolen Property, Property Destruction, and Offenses Involving Fraud or Deceit (Refs & Annos)

USSG, § 2B1.1, 18 U.S.C.A.

§ 2B1.1. Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property;
Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered
or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States

Currentness

**(a)** Base Offense Level:

**(1)** 7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or

**(2)** 6, otherwise.

**(b)** Specific Offense Characteristics

**(1)** If the loss exceeded $6,500, increase the offense level as follows:

| Loss (apply the greatest) | Increase in Level |
|---|---|
| **(A)** $6,500 or less............................................................................................................................ | no increase |
| **(B)** More than $6,500............................................................................................................ | add 2 |
| **(C)** More than $15,000.......................................................................................................... | add 4 |
| **(D)** More than $40,000.......................................................................................................... | add 6 |
| **(E)** More than $95,000.......................................................................................................... | add 8 |
| **(F)** More than $150,000........................................................................................................ | add 10 |
| **(G)** More than $250,000........................................................................................................ | add 12 |
| **(H)** More than $550,000........................................................................................................ | add 14 |

**(I)** More than $1,500,000....................................................................................................................................................... add 16

**(J)** More than $3,500,000....................................................................................................................................................... add 18

**(K)** More than $9,500,000....................................................................................................................................................... add 20

**(L)** More than $25,000,000..................................................................................................................................................... add 22

**(M)** More than $65,000,000.................................................................................................................................................... add 24

**(N)** More than $150,000,000.................................................................................................................................................. add 26

**(O)** More than $250,000,000.................................................................................................................................................. add 28

**(P)** More than $550,000,000.................................................................................................................................................. add 30.

**(2)** (Apply the greatest) If the offense--

**(A)**(i) involved 10 or more victims; (ii) was committed through mass-marketing; or (iii) resulted in substantial financial hardship to one or more victims, increase by 2 levels;

**(B)** resulted in substantial financial hardship to five or more victims, increase by 4 levels; or

**(C)** resulted in substantial financial hardship to 25 or more victims, increase by 6 levels.

**(3)** If the offense involved a theft from the person of another, increase by 2 levels.

**(4)** If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 2 levels.

**(5)** If the offense involved theft of, damage to, destruction of, or trafficking in, property from a national cemetery or veterans' memorial, increase by 2 levels.

**(6)** If (A) the defendant was convicted of an offense under 18 U.S.C. § 1037; and (B) the offense involved obtaining electronic mail addresses through improper means, increase by 2 levels.

**(7)** If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $1,000,000, increase by 2 levels; (ii) more than $7,000,000, increase by 3 levels; or (iii) more than $20,000,000, increase by 4 levels.

**(8)** (Apply the greater) If--

**(A)** the offense involved conduct described in 18 U.S.C. § 670, increase by 2 levels; or

**(B)** the offense involved conduct described in 18 U.S.C. § 670, and the defendant was employed by, or was an agent of, an organization in the supply chain for the pre-retail medical product, increase by 4 levels.

**(9)** If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency; (B) a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding; (C) a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines; or (D) a misrepresentation to a consumer in connection with obtaining, providing, or furnishing financial assistance for an institution of higher education, increase by 2 levels. If the resulting offense level is less than level 10, increase to level 10.

**(10)** If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

**(11)** If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

**(12)** If the offense involved conduct described in 18 U.S.C. § 1040, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

**(13)** If the defendant was convicted under 42 U.S.C. 408(a), 1011(a), or 1383a(a) and the statutory maximum term of ten years' imprisonment applies, increase by 4 levels. If the resulting offense level is less than 12, increase to level 12.

**(14)** (Apply the greater) If the offense involved misappropriation of a trade secret and the defendant knew or intended--

   **(A)** that the trade secret would be transported or transmitted out of the United States, increase by 2 levels; or

   **(B)** that the offense would benefit a foreign government, foreign instrumentality, or foreign agent, increase by 4 levels.

      If subparagraph (B) applies and the resulting offense level is less than level 14, increase to level 14.

**(15)** If the offense involved an organized scheme to steal or to receive stolen (A) vehicles or vehicle parts; or (B) goods or chattels that are part of a cargo shipment, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

<"Personal information" means sensitive or private information involving an identifiable individual (including such information in the possession of a third party), including (A) medical records; (B) wills; (C) diaries; (D) private correspondence, including e-mail; (E) financial records; (F) photographs of a sensitive or private nature; or (G) similar information.>

<"Pre-retail medical product" has the meaning given that term in 18 U.S.C. § 670(e).>

<"Publicly traded company" means an issuer (A) with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*); or (B) that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78*o*(d)). "Issuer" has the meaning given that term in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. § 78c).>

<"Supply chain" has the meaning given that term in 18 U.S.C. § 670(e).>

<"Theft from the person of another" means theft, without the use of force, of property that was being held by another person or was within arms' reach. Examples include pick-pocketing and non-forcible purse-snatching, such as the theft of a purse from a shopping cart.>

<"Trade secret" has the meaning given that term in 18 U.S.C. § 1839(3).>

<"Veterans' memorial" means any structure, plaque, statue, or other monument described in 18 U.S.C. § 1369(a).>

<"Victim" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense. "Person" includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies.>

<**2. Application of Subsection (a)(1).--**>
  <**(A)** "Referenced to this Guideline".--For purposes of subsection (a)(1), an offense is "referenced to this guideline" if (i) this guideline is the applicable Chapter Two guideline specifically referenced in Appendix A (Statutory Index) for the offense of conviction, as determined under the provisions of § 1B1.2 (Applicable Guidelines); or (ii) in the case of a conviction for conspiracy, solicitation, or attempt to which § 2X1.1 (Attempt, Solicitation, or Conspiracy) applies, this guideline is the appropriate guideline for the offense the defendant was convicted of conspiring, soliciting, or attempting to commit.>

  <**(B) Definition of "Statutory Maximum Term of Imprisonment."**--For purposes of this guideline, "statutory maximum term of imprisonment" means the maximum term of imprisonment authorized for the offense of conviction, including any increase in that maximum term under a statutory enhancement provision.>

  <**(C) Base Offense Level Determination for Cases Involving Multiple Counts.**--In a case involving multiple counts sentenced under this guideline, the applicable base offense level is determined by the count of conviction that provides the highest statutory maximum term of imprisonment.>

<**3. Loss Under Subsection (b)(1).**--This application note applies to the determination of loss under subsection (b)(1).>

  <**(A) General Rule.**--Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.>
    <**(i) Actual Loss.**--"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

<**(ii) Intended Loss.--**"Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).>

<**(iii) Pecuniary Harm.--**"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.>

<**(iv) Reasonably Foreseeable Pecuniary Harm.--**For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.>

<**(v) Rules of Construction in Certain Cases.--**In the cases described in subdivisions (I) through (III), reasonably foreseeable pecuniary harm shall be considered to include the pecuniary harm specified for those cases as follows:>

<**(I) Product Substitution Cases.--**In the case of a product substitution offense, the reasonably foreseeable pecuniary harm includes the reasonably foreseeable costs of making substitute transactions and handling or disposing of the product delivered, or of retrofitting the product so that it can be used for its intended purpose, and the reasonably foreseeable costs of rectifying the actual or potential disruption to the victim's business operations caused by the product substitution.>

<**(II) Procurement Fraud Cases.--**In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correct the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable.>

<**(III) Offenses Under 18 U.S.C. § 1030.--**In the case of an offense under 18 U.S.C. § 1030, actual loss includes the following pecuniary harm, regardless of whether such pecuniary harm was reasonably foreseeable: Any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other damages incurred because of interruption of service.>

<**(B) Gain.--**The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.>

<**(C) Estimation of Loss.--**The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. See 18 U.S.C. § 3742(e) and (f).>

<The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:>

<**(i)** The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.>

<**(ii)** In the case of proprietary information (e.g., trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense.>

<**(iii)** The cost of repairs to damaged property.>

<**(iv)** The approximate number of victims multiplied by the average loss to each victim.>

<**(v)** The reduction that resulted from the offense in the value of equity securities or other corporate assets.>

<**(vi)** More general factors, such as the scope and duration of the offense and revenues generated by similar operations.>

<**(D) Exclusions from Loss.--**Loss shall not include the following:>
<**(i)** Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs.>

<**(ii)** Costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense.>

<**(E) Credits Against Loss.--**Loss shall be reduced by the following:>
<**(i)** The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.>

<**(ii)** In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.>

<**(iii)** Notwithstanding clause (ii), in the case of a fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere.>

<In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value. In determining whether the most recent tax assessment value is a reasonable estimate of the fair market value, the court may consider, among other factors, the recency of the tax assessment and the extent to which the jurisdiction's tax assessment practices reflect factors not relevant to fair market value.>

<**(F) Special Rules.--**Notwithstanding subdivision (A), the following special rules shall be used to assist in determining loss in the cases indicated:>
<**(i) Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes.--**In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device. However, if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account (including an electronic serial number/ mobile identification number (ESN/MIN) pair), and that means was only possessed, and not used, during the

commission of the offense, loss shall be not less than $100 per unused means. For purposes of this subdivision, "counterfeit access device" and "unauthorized access device" have the meaning given those terms in Application Note 10(A).>

<(ii) Government Benefits.--In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.>

<(iii) Davis-Bacon Act Violations.--In a case involving a Davis-Bacon Act violation (i.e., a violation of 40 U.S.C. § 3142, criminally prosecuted under 18 U.S.C. § 1001), the value of the benefits shall be considered to be not less than the difference between the legally required wages and actual wages paid.>

<(iv) Ponzi and Other Fraudulent Investment Schemes.--In a case involving a fraudulent investment scheme, such as a Ponzi scheme, loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in access of that investor's principal investment (i.e., the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme).>

<(v) Certain Other Unlawful Misrepresentation Schemes.--In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.>

<(vi) Value of Controlled Substances.--In a case involving controlled substances, loss is the estimated street value of the controlled substances.>

<(vii) Value of Cultural Heritage Resources or Paleontological Resources.--In a case involving a cultural heritage resource or paleontological resource, loss attributable to that resource shall be determined in accordance with the rules for determining the "value of the resource" set forth in Application Note 2 of the Commentary to § 2B1.5.>

<(viii) Federal Health Care Offenses Involving Government Health Care Programs.--In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted.>

<(ix) Fraudulent Inflation or Deflation in Value of Securities or Commodities.--In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances. One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by--
  <(I) calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and>

  <(II) multiplying the difference in average price by the number of shares outstanding.>

all or part of that benefit (e.g., for the defendant's personal gain). Subsection (b)(9)(A) applies, for example, to the following:>

<(i) A defendant who solicited contributions for a non-existent famine relief organization.>

<(ii) A defendant who solicited donations from church members by falsely claiming to be a fundraiser for a religiously affiliated school.>

<(iii) A defendant, chief of a local fire department, who conducted a public fundraiser representing that the purpose of the fundraiser was to procure sufficient funds for a new fire engine when, in fact, the defendant intended to divert some of the funds for the defendant's personal benefit.>

<(C) Fraud in Contravention of Prior Judicial Order.--Subsection (b)(9)(C) provides an enhancement if the defendant commits a fraud in contravention of a prior, official judicial or administrative warning, in the form of an order, injunction, decree, or process, to take or not to take a specified action. A defendant who does not comply with such a prior, official judicial or administrative warning demonstrates aggravated criminal intent and deserves additional punishment. If it is established that an entity the defendant controlled was a party to the prior proceeding that resulted in the official judicial or administrative action, and the defendant had knowledge of that prior decree or order, this enhancement applies even if the defendant was not a specifically named party in that prior case. For example, a defendant whose business previously was enjoined from selling a dangerous product, but who nonetheless engaged in fraudulent conduct to sell the product, is subject to this enhancement. This enhancement does not apply if the same conduct resulted in an enhancement pursuant to a provision found elsewhere in the guidelines (e.g., a violation of a condition of release addressed in § 3C1.3 (Commission of Offense While on Release) or a violation of probation addressed in § 4A1.1 (Criminal History Category)).>

<(D) College Scholarship Fraud.--For purposes of subsection (b)(9)(D):>

<"Financial assistance" means any scholarship, grant, loan, tuition, discount, award, or other financial assistance for the purpose of financing an education.>

<"Institution of higher education" has the meaning given that term in section 101 of the Higher Education Act of 1954 (20 U.S.C. § 1001).>

<(E) Non-Applicability of Chapter Three Adjustments.-->
<(i) Subsection (b)(9)(A).--If the conduct that forms the basis for an enhancement under subsection (b)(9)(A) is the only conduct that forms the basis for an adjustment under § 3B1.3 (Abuse of Position of Trust or Use of Special Skill), do not apply that adjustment under § 3B1.3.>

<(ii) Subsection (b)(9)(B) and (C).--If the conduct that forms the basis for an enhancement under subsection (b)(9)(B) or (C) is the only conduct that forms the basis for an adjustment under § 3C1.1 (Obstructing or Impeding the Administration of Justice), do not apply that adjustment under § 3C1.1.>

<9. Application of Subsection (b)(10).-->

<(A) Definition of United States.--For purposes of subsection (b)(10)(B), "United States" means each of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa.>

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by  U.S. v. Booker,  U.S.,  Jan. 12, 2005

United States Code Annotated
  Federal Sentencing Guidelines (Refs & Annos)
    Chapter Three. Adjustments (Refs & Annos)
      Part C. Obstruction and Related Adjustments (Refs & Annos)

USSG, § 3C1.1, 18 U.S.C.A.

§ 3C1.1. Obstructing or Impeding the Administration of Justice

Currentness

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

## CREDIT(S)

(Effective November 1, 1987; amended effective November 1, 1989; November 1, 1990; November 1, 1991; November 1, 1992; November 1, 1993; November 1, 1997; November 1, 1998; November 1, 2002; November 1, 2004; November 1, 2006; November 1, 2010; November 1, 2011; November 1, 2014; November 1, 2018; November 1, 2023.)

## COMMENTARY

<Application Notes:>

<1. In General.--This adjustment applies if the defendant's obstructive conduct (A) occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant. Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.>

<2. Limitations on Applicability of Adjustment.--This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.>

<3. Covered Conduct Generally.--Obstructive conduct can vary widely in nature, degree of planning, and seriousness. Application Note 4 sets forth examples of the types of conduct to which this adjustment is intended to

apply. Application Note 5 sets forth examples of less serious forms of conduct to which this adjustment is not intended to apply, but that ordinarily can appropriately be sanctioned by the determination of the particular sentence within the otherwise applicable guideline range. Although the conduct to which this enhancement applies is not subject to precise definition, comparison of the examples set forth in Application Notes 4 and 5 should assist the court in determining whether application of this adjustment is warranted in a particular case.>

<**4. Examples of Covered Conduct.--**The following is a non-exhaustive list of examples of the types of conduct to which this adjustment applies:>

<**(A)** threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;>

<**(B)** committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;>

<**(C)** producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;>

<**(D)** destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender;>

<**(E)** escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding;>

<**(F)** providing materially false information to a judge or magistrate judge;>

<**(G)** providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;>

<**(H)** providing materially false information to a probation officer in respect to a presentence or other investigation for the court;>

<**(I)** other conduct prohibited by obstruction of justice provisions under title 18, United States Code (e.g., 18 U.S.C. §§ 1510, 1511);>

<**(J)** failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. § 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. § 853(p);>

<**(K)** threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.>

<This adjustment also applies to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense where there is a separate count of conviction for such conduct.>

<**5. Examples of Conduct Ordinarily Not Covered.--**Some types of conduct ordinarily do not warrant application of this adjustment but may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply (e.g., § 3E1.1 (Acceptance of Responsibility)). However, if the defendant is convicted of a separate count for such conduct, this adjustment will apply and increase the offense level for the underlying offense (i.e., the offense with respect to which the obstructive conduct occurred). See Application Note 8, below.>

<The following is a non-exhaustive list of examples of the types of conduct to which this application note applies:>

<**(A)** providing a false name or identification document at arrest, except where such conduct actually resulted in a significant hindrance to the investigation or prosecution of the instant offense;>

<**(B)** making false statements, not under oath, to law enforcement officers, unless Application Note 4(G) above applies;>

<**(C)** providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation;>

<**(D)** avoiding or fleeing from arrest (see, however, § 3C1.2 (Reckless Endangerment During Flight));>

<**(E)** lying to a probation or pretrial services officer about defendant's drug use while on pre-trial release, although such conduct may be a factor in determining whether to reduce the defendant's sentence under § 3E1.1 (Acceptance of Responsibility).>

<**6. "Material" Evidence Defined.--**"Material" evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination.>

<**7. Inapplicability of Adjustment in Certain Circumstances.--**If the defendant is convicted for an offense covered by § 2J1.1 (Contempt), § 2J1.2 (Obstruction of Justice), § 2J1.3 (Perjury or Subornation of Perjury; Bribery of Witness), § 2J1.5 (Failure to Appear by Material Witness), § 2J1.6 (Failure to Appear by Defendant), § 2J1.9 (Payment to Witness), § 2X3.1 (Accessory After the Fact), or § 2X4.1 (Misprision of Felony), this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense).>

<Similarly, if the defendant receives an enhancement under § 2D1.1(b)(16)(D), do not apply this adjustment.>

<**8. Grouping Under § 3D1.2(c).--**If the defendant is convicted both of an obstruction offense (e.g., 18 U.S.C. § 3146 (Penalty for failure to appear); 18 U.S.C. § 1621 (Perjury generally)) and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 (Groups of Closely Related Counts). The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.>

<**9. Accountability for § 1B1.3(a)(1)(A) Conduct.--**Under this section, the defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused.>

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by  U.S. v. Booker,  U.S.,  Jan. 12, 2005

United States Code Annotated
    Federal Sentencing Guidelines (Refs & Annos)
        Chapter Five. Determining the Sentence (Refs & Annos)
            Part G. Implementing the Total Sentence of Imprisonment

USSG, § 5G1.3, 18 U.S.C.A.

§ 5G1.3. Imposition of a Sentence on a Defendant Subject to an Undischarged
Term of Imprisonment or Anticipated State Term of Imprisonment

Currentness

**(a)** If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.

**(b)** If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:

  **(1)** the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

  **(2)** the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

**(c)** If subsection (a) does not apply, and a state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment.

**(d)** (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

**CREDIT(S)**

(Effective November 1, 1987; amended effective November 1, 1989; November 1, 1991; November 1, 1992; November 1, 1993; November 1, 1995; November 1, 2002; November 1, 2003; November 1, 2010; November 1, 2013; November 1, 2014; November 1, 2016; November 1, 2023.)

**COMMENTARY**

<*Application Notes:*>

<**1. Consecutive Sentence--Subsection (a) Cases.** Under subsection (a), the court shall impose a consecutive sentence when the instant offense was committed while the defendant was serving an undischarged term of imprisonment or after sentencing for, but before commencing service of, such term of imprisonment.>

<**2. Application of Subsection (b).--**>

<**(A) In General.**--Subsection (b) applies in cases in which all of the prior offense is relevant conduct to the instant offense under the provisions of subsection (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct). Cases in which only part of the prior offense is relevant conduct to the instant offense are covered under subsection (d).>

<**(B) Inapplicability of Subsection (b).**--Subsection (b) does not apply in cases in which the prior offense was not relevant conduct to the instant offense under § 1B1.3(a)(1), (a)(2), or (a)(3) (e.g., the prior offense is a prior conviction for which the defendant received an increase under § 2L1.2 (Unlawfully Entering or Remaining in the United States), or the prior offense was a crime of violence for which the defendant received an increased base offense level under § 2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition)).>

<**(C) Imposition of Sentence.**--If subsection (b) applies, and the court adjusts the sentence for a period of time already served, the court should note on the Judgment in a Criminal Case Order (i) the applicable subsection (e.g., § 5G1.3(b)); (ii) the amount of time by which the sentence is being adjusted; (iii) the undischarged term of imprisonment for which the adjustment is being given; and (iv) that the sentence imposed is a sentence reduction pursuant to § 5G1.3(b) for a period of imprisonment that will not be credited by the Bureau of Prisons.>

<**(D) Example.**--The following is an example in which subsection (b) applies and an adjustment to the sentence is appropriate:>

<The defendant is convicted of a federal offense charging the sale of 90 grams of cocaine. Under § 1B1.3, the defendant is held accountable for the sale of an additional 25 grams of cocaine, an offense for which the defendant has been convicted and sentenced in state court. The defendant received a nine-month sentence of imprisonment for the state offense and has served six months on that sentence at the time of sentencing on the instant federal offense. The guideline range applicable to the defendant is 12-18 months (Chapter Two offense level of level 16 for sale of 115 grams of cocaine; 3 level reduction for acceptance of responsibility; final offense level of level 13; Criminal History Category I). The court determines that a sentence of 13 months provides the appropriate total punishment. Because the defendant has already served six months on the related state charge as of the date of sentencing on the instant federal offense, a sentence of seven months, imposed to run concurrently with the three months remaining on the defendant's state sentence, achieves this result.>

<**3. Application of Subsection (c).**--Subsection (c) applies to cases in which the federal court anticipates that, after the federal sentence is imposed, the defendant will be sentenced in state court and serve a state sentence before being transferred to federal custody for federal imprisonment. In such a case, where the other offense is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment.>

<**4. Application of Subsection (d).--**>

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by   U.S. v. Booker,   U.S.,   Jan. 12, 2005

> United States Code Annotated
>     Federal Sentencing Guidelines (Refs & Annos)
>         Chapter Six. Sentencing Procedures, Plea Agreements, and Crime Victims' Rights (Refs & Annos)
>         Part A. Sentencing Procedures (Refs & Annos)

USSG, § 6A1.3, 18 U.S.C.A.

§ 6A1.3. Resolution of Disputed Factors (Policy Statement)

Currentness

**(a)** When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

**(b)** The court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P.

## CREDIT(S)

(Effective November 1, 1987; amended effective November 1, 1989; November 1, 1991; November 1, 1997; November 1, 1998; November 1, 2004.)

## COMMENTARY

<Although lengthy sentencing hearings seldom should be necessary, disputes about sentencing factors must be resolved with care. When a dispute exists about any factor important to the sentencing determination, the court must ensure that the parties have an adequate opportunity to present relevant information. Written statements of counsel or affidavits of witnesses may be adequate under many circumstances. See, e.g., United States v. Ibanez, 924 F.2d 427 (2d Cir. 1991). An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues. See, e.g., United States v. Jimenez Martinez, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); United States v. Roberts, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity); see also, United States v. Fatico, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979), cert. denied, 444 U.S. 1073 (1980). The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.>

<In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. See 18 U.S.C. § 3661; see also United States v. Watts, 519 U.S. 148, 154 (1997) (holding that lower evidentiary standard at sentencing permits sentencing court's consideration of acquitted conduct); Witte v. United States, 515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered wide range of information without the procedural protections of a criminal trial, including information concerning criminal conduct that may be the

**Restatement (Third) of the Law Governing Lawyers § 37 (2000)**

Restatement of the Law - The Law Governing Lawyers | October 2023 Update

Restatement (Third) of The Law Governing Lawyers

Chapter 3. Client and Lawyer: The Financial
and Property Relationship

Topic 1. Legal Controls on Attorney Fees

# § 37 Partial or Complete Forfeiture of a Lawyer's Compensation

Comment:
Reporter's Note
Case Citations - by Jurisdiction

> **A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter. Considerations relevant to the question of forfeiture include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies.**

**Comment:**

*a. Scope and cross-references; relation to other doctrines.* Even if a fee is otherwise reasonable (see § 34) and complies with the other requirements of this Chapter, this Section can in some circumstances lead to forfeiture. See also § 41, on abusive fee-collection methods, and § 43, Comments *f* and *g,* discussing the discharge of attorney liens. A client who has already paid a fee subject to forfeiture can sue to recover it (see §§ 33(1) & 42).

A lawyer's improper conduct can reduce or eliminate the fee that the lawyer may reasonably charge under § 34 (see Comment *c* thereof). A lawyer is not entitled to be paid for services rendered in violation of the lawyer's duty to a client or for services needed to alleviate the consequences of the lawyer's misconduct. See Restatement Second, Agency § 469 (agent entitled to no compensation for conduct which is disobedient or breach of duty of loyalty to principal). A tribunal will also consider misconduct more broadly, as evidence of the lawyer's lack of competence and loyalty, and hence of the value of the lawyer's services.

---

**Illustration:**

> 1. Lawyer has been retained at an hourly rate to negotiate a contract for Client. Lawyer assures the other parties that Client has consented to a given term, knowing this to be incorrect. Lawyer devotes five hours to working out the details of the term. When Client insists that the term be stricken (see § 22), Lawyer devotes four more hours to explaining to the other parties that Lawyer's lack of authority and Client's rejection of the term requires further negotiations. Lawyer is not entitled to compensation for any of those nine hours of time under either § 34 or § 39. The tribunal, moreover, may properly consider the incident if it bears on the value of such Lawyer's other time as is otherwise reasonably compensable.

---

Second, under contract law a lawyer's conduct can render unenforceable the lawyer's fee contract with a client. Thus under contract law the misconduct could constitute a material breach of contract (see § 40) or vitiate the formation of the contract (as in the case of misrepresentations concerning the lawyer's credentials). Alternatively, the contract can be unenforceable because it contains an unlawful provision (see Restatement Second, Contracts §§ 163, 164, 184, 237, 241, & 374; Restatement Second, Agency § 467). In some cases, although the contract is unenforceable on its own terms, the lawyer will still be able to recover the fair value of services rendered (see § 39, Comment *e*).

Third, a lawyer's misconduct can constitute malpractice rendering the lawyer liable for any resulting damage to the client under the common law or, in some jurisdictions, a consumer-protection statute (see § 41, Comment *b*). Malpractice damages can be greater or smaller than the forfeited fees. Conduct constituting malpractice is not always the same as conduct warranting fee forfeiture. A lawyer's negligent legal research, for example, might constitute malpractice, but will not necessarily lead to fee forfeiture. On malpractice liability and measures of damages generally, see § 53. On the duty of an agent to recompense a principal for loss caused by the agent's breach of duty, see Restatement Second, Agency § 401.

*b. Rationale.* The remedy of fee forfeiture presupposes that a lawyer's clear and serious violation of a duty to a client destroys or severely impairs the client-lawyer relationship and thereby the justification of the lawyer's claim to compensation. See Restatement Second, Trusts § 243 (court has discretion to deny or reduce compensation of trustee who commits breach of trust); cf. Restatement Second, Agency § 456(b) (willful and deliberate breach disentitles agent to recover in quantum meruit when agency contract does not apportion compensation). Forfeiture is also a deterrent. The damage that misconduct causes is often difficult to assess. In addition, a tribunal often can determine a forfeiture sanction more easily than a right to compensating damages.

Forfeiture of fees, however, is not justified in each instance in which a lawyer violates a legal duty, nor is total forfeiture always appropriate. Some violations are inadvertent or do not significantly harm the client. Some can be adequately dealt with by the remedies described in Comment *a* or by a partial forfeiture (see Comment *e*). Denying the lawyer all compensation would sometimes be an excessive sanction, giving a windfall to a client. The remedy of this Section should hence be applied with discretion.

*c. Violation of a duty to a client.* This Section provides for forfeiture when a lawyer engages in a clear and serious violation (see Comment *d* hereto) of a duty to the client. The source of the duty can be civil or criminal law, including, for example, the requirements of an applicable lawyer code or the law of malpractice. The misconduct might have occurred when the lawyer was retained, during the representation, or during attempts to collect a fee (see § 41). On improper withdrawal as a ground for forfeiture, see § 40, Comment *e*.

The Section refers only to duties that a lawyer owes to a client, not to those owed to other persons. That a lawyer, for example, harassed an opponent in litigation without harming the client does not warrant relieving the client of any duty to pay the lawyer. On other remedies in such situations, see § 110. But sometimes harassing a nonclient will also violate the lawyer's duty to the

---

client, perhaps exposing the client to demands for sanctions or making the client's cause less likely to prevail. Forfeiture will then be appropriate unless the client is primarily responsible for the breach of duty to a nonclient.

*d. A clear and serious violation—relevant factors.* A lawyer's violation of duty to a client warrants fee forfeiture only if the lawyer's violation was clear. A violation is clear if a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was wrongful. The sanction of fee forfeiture should not be applied to a lawyer who could not have been expected to know that conduct was forbidden, for example when the lawyer followed one reasonable interpretation of a client-lawyer contract and another interpretation was later held correct.

To warrant fee forfeiture a lawyer's violation must also be serious. Minor violations do not justify leaving the lawyer entirely unpaid for valuable services rendered to a client, although some such violations will reduce the size of the fee or render the lawyer liable to the client for any harm caused (see Comment *a* hereto).

In approaching the ultimate issue of whether violation of duty warrants fee forfeiture, several factors are relevant. The extent of the misconduct is one factor. Normally, forfeiture is more appropriate for repeated or continuing violations than for a single incident. Whether the breach involved knowing violation or conscious disloyalty to a client is also relevant. See Restatement Second, Agency § 469 (forfeiture for willful and deliberate breach). Forfeiture is generally inappropriate when the lawyer has not done anything willfully blameworthy, for example, when a conflict of interest arises during a representation because of the unexpected act of a client or third person.

Forfeiture should be proportionate to the seriousness of the offense. For example, a lawyer's failure to keep a client's funds segregated in a separate account (see § 44) should not result in forfeiture if the funds are preserved undiminished for the client. But forfeiture is justified for a flagrant violation even though no harm can be proved.

The adequacy of other remedies is also relevant. If, for example, a lawyer improperly withdraws from a representation and is consequently limited to a quantum meruit recovery significantly smaller than the fee contract provided (see § 40), it might be unnecessary to forfeit the quantum meruit recovery as well.

*e. Extent of forfeiture.* Ordinarily, forfeiture extends to all fees for the matter for which the lawyer was retained, such as defending a criminal prosecution or incorporating a corporation. (For a possibly more limited loss of fees under other rules, see Comment *a* hereto.) See § 42 (client's suit for refund of fees already paid). Forfeiture does not extend to a disbursement made by the lawyer to the extent it has conferred a benefit on the client (see § 40, Comment *d*).

Sometimes forfeiture for the entire matter is inappropriate, for example when a lawyer performed valuable services before the misconduct began, and the misconduct was not so grave as to require forfeiture of the fee for all services. Ultimately the question is one of fairness in view of the seriousness of the lawyer's violation and considering the special duties imposed on lawyers, the gravity, timing, and likely consequences to the client of the lawyer's misbehavior, and the connection between the various services performed by the lawyer.

When a lawyer-employee of a client is discharged for misconduct, except in an extreme instance this Section does not warrant forfeiture of all earned salary and pension entitlements otherwise due. The lawyer's loss of employment will itself often be a penalty graver than would be the loss of a fee for a single matter for a nonemployee lawyer. Employers, moreover, are often in a better position to protect themselves against misconduct of their lawyer-employees through supervision and other means. See Comment *a* hereto; Restatement Second, Agency § 401. For an employer's liability for unjust discharge of a lawyer employee, see § 32, Comment *b*.

**Reporter's Note**

*Comment a. Scope and cross-references; relation to other doctrines.*For reduction of what is otherwise a reasonable fee due to a lawyer's derelictions, see, e.g., Newman v. Silver, 553 F.Supp. 485 (S.D.N.Y.1982), aff'd in relevant part, 713 F.2d 14 (2d Cir.1983); Murphy v. Stringer, 285 So.2d 340 (La.Ct.App.1973); 1 R. Mallen & J. Smith, Legal Malpractice § 11.24 (3d ed.1989). For misconduct that renders a fee contract unenforceable but allows recovery of the fair value of the lawyer's services, see, e.g., In re Rosenman & Colin, 850 F.2d 57 (2d Cir.1988) (failure to send monthly bills in breach of contract); In re Kamerman, 278 F.2d 411 (2d Cir.1960) (champertous contract); Mattioni, Mattioni & Mattioni, Ltd. v. Ecological Shipping Corp., 530 F.Supp. 910 (E.D.Pa.1981) (contract requiring lawyer's consent to settlement); Anderson v. Anchor Organization,

654 N.E.2d 675 (Ill.App.Ct.1995) (court has discretion to allow quantum meruit recovery when contract provides for contingent fee larger than allowed by statute). For the application of some consumer-protection statutes to lawyers, see § 41, Comment *b*, and Reporter's Note thereto.

*Comment b. Rationale.* See generally Perillo, The Law of Lawyer's Contract is Different, 67 Fordham L. Rev. 443, 446-49 (1998) (criticizing the Section as "lawyer friendly" compared to general contracts law).

*Comment c. Violation of a duty to a client.* For examples of breaches justifying fee forfeiture, see, e.g., Silbiger v. Prudence Bonds Corp., 180 F.2d 917 (2d Cir.) (L. Hand, C.J.), cert. denied, 340 U.S. 813, 71 S.Ct. 40, 95 L.Ed. 597 (1950) ("Certainly by the beginning of the Seventeenth Century it had become a common-place that an attorney must not represent opposed interests, and the usual consequence has been that he is debarred from receiving any fee from either, no matter how successful his labors."); Crawford & Lewis v. Boatmen's Trust Co., 1 S.W.3d 417 (Ark.1999) (conflict of interests); Jeffry v. Pounds, 136 Cal.Rptr. 373 (Cal.Ct.App.1977) (forfeiture for agreeing to represent client's wife in divorce); Jackson v. Griffith, 421 So.2d 677 (Fla.Dist.Ct.App.1982) (coercing client into contract); Sanders v. Townsend, 509 N.E.2d 860 (Ind.Ct.App.1987), aff'd in part, vacated in part, 582 N.E.2d 355 (Ind.1991) (coercing client to accept poor settlement); Rice v. Perl, 320 N.W.2d 407 (Minn.1982) (not disclosing to client that lawyer's firm employs opposing party's adjuster in other matters); Ranta v. McCarney, 391 N.W.2d 161 (N.D.1986) (practicing in state where not admitted); Crawford v. Logan, 656 S.W.2d 360 (Tenn.1983) (failing to return former client's papers); Burrow v. Arce, 997 S.W.2d 229 (Tex.1999) (following Restatement approach). Compare In re Rosenman & Colin, 850 F.2d 57 (2d Cir.1988) (breach of contract barred recovery on contract, but did not forfeit all compensation); Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Scheller, 629 So.2d 947 (Fla.Dist.Ct.App.1993) (court has discretion as to forfeiture when lawyer pressured client to change fee contract).

On breach of duty to nonclients, compare, e.g., Blick v. Marks, Stokes & Harrison, 360 S.E.2d 345 (Va.1987) (no forfeiture when lawyer helped represent client after hearing part of case as parttime judge, because client not harmed), with, e.g., Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot, 458 A.2d 545 (Pa.Super.Ct.1983) (lawyer whose advice to commit perjury led to client's conviction must refund fee).

*Comment d. A clear and serious violation—relevant factors.* Some courts have refused to hold fees forfeited when the client was not harmed. E.g., Frank v. Bloom, 634 F.2d 1245 (10th Cir.1980) (lawyer was disobedient); Brillhart v. Hudson, 455 P.2d 878 (Colo.1969) (no forfeiture when contingent-fee contract held grossly unreasonable); Crawford v. Logan, 656 S.W.2d 360 (Tenn.1983) (fees forfeited for failure to return evidence to client when representation ended, unless lawyer shows no prejudice); Burk v. Burzynski, 672 P.2d 419 (Wyo.1983) (lawyer disclosed confidences that a client had already revealed); compare Jackson v. Griffith, 421 So.2d 677 (Fla.Dist.Ct.App.1982) (forfeiture when fee contract obtained by coercion), with Guenard v. Burke, 443 N.E.2d 892 (Mass.1982) (no forfeiture when lawyer violated court rule by not signing contract). On impalpable and improbable harm, see, e.g., Hendry v. Pelland, 73 F.3d 397 (D.C.Cir.1996) (forfeiture for conflict of interest regardless of lack of harm); In re Eastern Sugar Antitrust Litigation, 697 F.2d 524 (3d Cir.1982) (forfeiture for failure of law firm representing a class to disclose to court merger negotiations with opposing party's law firm); Silbiger v. Prudence Bonds Corp., 180 F.2d 917, 921 (2d Cir.) (L. Hand, C.J.), cert. denied, 340 U.S. 813, 71 S.Ct. 40, 95 L.Ed. 597 (1950) (dictum) (lawyer with conflict of interests may not avoid forfeiture solely by showing no actual harm); Rice v. Perl, 320 N.W.2d 407 (Minn.1982) (lawyer forfeits fees for failure to disclose to client lawyer's firm's employment of opposing party's adjuster in other matters; no proof of actual harm required); Spivak v. Sachs, 211 N.E.2d 329 (N.Y.1965) (lawyer not admitted to practice in state where services performed not entitled to fee); Burrow v. Arce, 997 S.W.2d 229 (Tex.1999) (client need not demonstrate harm); Eriks v. Denver, 824 P.2d 1207 (Wash.1992) (court may require fee refund for conflict of interest without showing of harm).

On the relevance of the lawyer's intent, compare, e.g., Moses v. McGarvey, 614 P.2d 1363 (Alaska 1980) (former corporate counsel who brought derivative suit forfeits fees regardless of absence of improper motive); Jeffry v. Pounds, 136 Cal.Rptr. 373 (Cal.Ct.App.1977) (lawyer who brought suit for one client against another client in unrelated matter forfeits fee although lawyer did not realize this was forbidden), with Hill v. Douglass, 271 So.2d 1 (Fla.1972) (no forfeiture of fees for services rendered before lawyer should have known he would probably be witness); E. Wood, Fee Contracts of Lawyers 237-45 (1936) (forfeiture for negligent misbehavior); Note, Toward a Uniform System of Attorney Fee Forfeiture, 9 Cardozo L. Rev. 1859 (1988). On nonrecoverability of fees for services performed in a jurisdiction where the lawyer was not admitted to practice, see Note, Out-of-State Attorney Fee Forfeiture, 8 Cardozo L. Rev. 1191 (1987). For norms whose breach warrants forfeiture, see Reporter's Note to Comment *c* hereto.

*Comment e. Extent of forfeiture.* See In re Eastern Sugar Antitrust Litigation, 697 F.2d 524 (3d Cir.1982) (no forfeiture for services rendered before lawyer's violation, unless need to discipline and deter egregious violation outweighs other concerns);

In re Brandon, 902 P.2d 1299, 1317 (Alaska 1995) (conflict of interest warrants forfeiture; whether automatic or proportionate by weighing all factors to be decided on review following remand for full development of facts); Hill v. Douglass, 271 So.2d 1 (Fla.1972) (no forfeiture for services before lawyer should have known he would be witness); Bryan v. Granade, 357 S.E.2d 92 (Ga.1987) (lawyer did not forfeit fee for having will set aside by later plundering estate as administrator); Gilchrist v. Perl, 387 N.W.2d 412 (Minn.1986) (forfeiture usually total; but when there was no fraud, bad faith, or actual harm to clients and many potential plaintiffs, courts should use punitive-damages standards to determine how large a forfeiture is appropriate); Davis v. Taylor, 344 S.E.2d 19 (N.C.Ct.App.1986) (lawyer forfeits fee for period during which improper divorce contingent-fee contract was in effect); Burrow v. Arce, 997 S.W.2d 229 (Tex.1999) (judicial discretion); see § 40, Reporter's Note to Comment d. Compare Dewey v. R. J. Reynolds Tobacco Co., 536 A.2d 243 (N.J.1988) (firm with conflict of interest must remain in case but serve without compensation).

On nonforfeiture of the salary of a lawyer employee, see Schwartz v. Leonard, 526 N.Y.S.2d 506 (N.Y.App.Div.1988); cf. Greenberg v. Jerome H. Remick & Co., 129 N.E. 211 (N.Y.1920).

## Case Citations - by Jurisdiction

C.A.4,

C.A.9

C.A.D.C.

D.D.C.

S.D.Ind.

D.Mass.

D.Minn.Bkrtcy.Ct.

S.D.N.Y.Bkrtcy.Ct.

Cal.

Cal.App.

Colo.

Colo.O.P.D.J.

Fla.App.

Idaho,

Ind.App.

Mass.App.

Mo.

Nev.

Ohio App.

S.D.

Tex.

Tex.App.

Wash.

W.Va.

## C.A.4,

**C.A.4,** 2016. Quot. in sup. Law firm sued former client to recover attorney's fees related to litigation in which firm was disqualified from representing client for failing to obtain client's and adverse party's consent to firm's simultaneous representation of adverse party in an unrelated matter. The trial court granted firm's motion to compel arbitration based on the parties' engagement agreement. The arbitration panel entered judgment for firm; the trial court confirmed the award. This court reversed and remanded, holding that firm was not entitled to fees for the work it did while violating the rules of professional conduct. Citing Restatement Third of the Law Governing Lawyers § 37, the court explained that, even though client provided no evidence of damages, forfeiture of attorney's fees was appropriate because the damages caused by an attorney's misconduct

# CERTIFICATE OF RELATED CASES

I hereby certify that I am unaware of any pending case presenting an issue related to those raised in this brief.


DATED: November 3, 2023        */s Margaret A. Farrand*
                                           MARGARET A. FARRAND

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this opening brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 13,994 words.


DATED:  November 3, 2023          */s Margaret A. Farrand*
                                  MARGARET A. FARRAND